HULL, Circuit Judge:
Petitioner-Appellee Christine Lops filed a petition under the International Child Abduction Remedies Act (“ICARA”), 42 U.S.C. § 11601-10, seeking return of her two minor children to Germany. After conducting evidentiary hearings, the district court found that Petitioner’s former husband, Respondent Michael Lops, and his mother, Respondent Anne Harrington, wrongfully removed Petitioner’s minor children from Germany to the United States in violation of Petitioner’s custody rights. As authorized under ICARA, the district court ordered the children’s return to Germany with Petitioner. Respondents appeal. After review, we affirm.
I. FACTS
The issues in this appeal necessitate first a detailed review of the district court’s findings of fact and the evidence supporting them.
A. On January 31, 1995, Petitioner Initiates Divorce And Custody Proceedings In Germany
Petitioner and Respondent Lops were married in Germany in June 1991. Until they separated in January 1995, they lived with their two minor daughters, Claire and Carmen Lops, in Rodgau, Germany. On January 31, 1995, Petitioner initiated divorce and custody proceedings in the German family court for the district that was the marital and habitual residence of the parties. Alleging that Respondent Lops physically abused her, Petitioner sought sole custody of the children. From January 1995 to early May 1995, Petitioner and the children visited relatives and friends in Belgium.
On May 2, 1995, Petitioner and Respondent Lops appeared with counsel for their first hearing before the family court in Germany. Respondent Lops also sought sole custody of the children. Since the parties could not reach a custody agreement, Judge Rudolf Giwitz, the German family court judge, instructed the parties to appear with the children the following week. Even though Petitioner had returned to Germany with the children in early May 1995, the *930 animosity between Petitioner and Respondent Lops had increased due to Petitioner’s taking the children to Belgium for four months without Respondent Lops’s consent.
B. On May 10, 1995, Parties Agree To Share Custody At German Family Court Hearing
On May 10, 1995, the parties appeared again with counsel and the children before Judge Giwitz. At this “isolated proceeding of custody” hearing under German law, Judge Giwitz heard from each party and interviewed the children. In a letter written from Judge Giwitz to the district court, Judge Giwitz indicated that Petitioner expressed concerns that Respondent Lops would follow through on earlier threats to abduct the children and take them to the United States. Judge Giwitz’s letter further states that Respondent Lops dispelled these concerns by arguing that he was firmly rooted in Germany and had no further connection with the United States.[1]
As a result of the German family court proceeding, the parties agreed to share joint legal custody, with Petitioner retaining primary physical custody. Respondent Lops was allowed visitation rights based on his assurance to Judge Giwitz that he would return the children to Petitioner.
The parties’ agreement regarding custody of the children resulted in a suspension of the German family court proceedings. Judge Giwitz approved of Respondent Lops’s having a short visitation with the children immediately following the hearing, with the understanding that Respondent Lops would return the children that evening to Petitioner. The German court considered the parties’ custody agreement announced in court as binding on both parties.
C. On May 10, 1995, Respondent Lops Violates Custody Agreement
Immediately following the May 10 hearing, Respondent Lops visited with the children as authorized by Judge Giwitz. Once Respondent Lops obtained the children physically, he did not return the children to Petitioner as agreed, and understood by Petitioner and Judge Giwitz, only hours earlier. Petitioner objected and initiated efforts to contest this unilateral alteration of the parties’ agreement announced before Judge Giwitz.
Over the next two weeks, Petitioner resided with Respondent Lops’s aunt and visited the children daily in the marital residence, but she was never allowed to remain alone with the children. During this time, there was also some attempt at marital reconciliation, which soon failed.
D. On May 30, 1995, Respondents Fraudulently Obtain New Passports For The Children
Unbeknownst to Petitioner, Respondents planned to remove the children from Germany, but could not because the children’s passports were in Petitioner’s possession. The district court determined that Respondents misrepresented to Consulate officials that Petitioner had abandoned the children and thereby obtained new passports for the children on May 30, 1995. The district court expressly found, and the evidence showed, that Petitioner never abandoned the children and that she had parental custody rights not only by operation of German law but also by the agreement before and approved by the German family court judge.
E. On May SO, 1995, Petitioner Reopens Custody Proceedings In German Family Court, And On June 1, 1995, Respondent Lops Takes Children From Germany To Spain
On May 30, 1995, the same day Respondents obtained new passports for the children, Petitioner reopened the suspended custody proceedings before Judge Giwitz. However, on June 1, 1995, without Petitioner’s knowledge or consent and in violation of the parties’ custody agreement in Judge Gi *931 witz’s court, Respondent Lops took the children from Germany to Spain, where they stayed until approximately June 25, 1995. While Respondent Lops and the children were in Spain, Respondent Harrington, Respondent Lops’s mother, remained at the former marital residence in Rodgau, Germany.
F. On June 27, 1995, Respondent Harrington Takes Children To The United States
Respondent Lops and the children returned to Germany on June 25, 1995. Only two days later, Respondent Harrington took the children to the United States, without Petitioner’s knowledge or consent and in violation of her custody rights under German law and the parties’ custody agreement in Judge Giwitz’s court.
G. On July 3, 1995, German Family Court Conducts Another Hearing
Judge Giwitz held another custody hearing on July 3, 1995. Neither Respondent Lops nor his counsel revealed to the German family court, or Petitioner, that his mother, Respondent Harrington, had already taken the children to the United States, or that Respondent Lops was packing his furniture and belongings to leave for the United States only days later.
H. On July 8, 1995, Respondent Laps Joins Children In The United States But Conceals Whereabouts
On July 8, 1995, Respondent Lops left for the United States. Initially, Respondent Lops and the children stayed with Respondent Harrington in her home in Martinez near Augusta, Georgia. In early August 1995, Respondent Lops and the children moved into a home purchased by Respondent Harrington across Georgia’s border in North Augusta, South Carolina. The district court described the transaction for “this curiously purchased house” as “peculiar.” The purchase contract called for a down payment and a twenty-year mortgage, but Respondent Harrington was not to receive an executed deed to the home for tweniy years. Instead, the seller of the home remained its owner, and the lender held the deed from the seller to Respondent Harrington. The deed was to be transferred to Respondent Harrington only after all of the mortgage payments were made. Thus, the title to the South Carolina home apparently remained in the seller, arguably concealing its true ownership.
The district court found that over the next two and one-half years Respondent Lops and his mother, Respondent Harrington, took other more significant measures to conceal his and the children’s whereabouts from Petitioner. For example, Respondent Lops had no checking account and personally transacted business only in cash, including at times the children’s private school tuition.[2] Respondent Lops drove a $30,000 van registered under Respondent Harrington’s name. Despite the fact that he earned an annual six-figure income as a foreign exchange broker in Germany, Respondent Lops did not obtain any employment in the United States, which would have required him to disclose his social security number. Instead, he worked as a part-time independent contractor with House Rentals owned by his stepfather, Wayne Harrington. Respondent Lops, Mr. Harrington, and Mr. Harrington’s company did not have any real estate licenses.
Respondent Lops never reported any income or paid any federal or state income taxes in the United States during 1995, 1996, or 1997. In short, Respondent Lops had no “electronic identity.” As the district court aptly noted in its findings of fact:
Mr. Lops has no conventional credit, no credit cards, engages only in cash transactions; pays no utilities; his mother takes care of those; has no lease with his mother. This is a curious existence----
Notwithstanding his significant income reduction, Respondent Lops maintained a comfortable lifestyle, reportedly by borrowing from friends and family; yet, no loans had any documentation. Although living and driving in South Carolina for over two years, Respondent Lops never obtained a South *932 Carolina driver’s licence, nor did any insurance policy list Respondent Lops as an authorized driver of the van. The district court’s findings of fact concluded:
... I see Mr. Michael Lops in a situation or in a position or pattern of continuing deception and even if every word that he says about his income and his business affairs is to be believed he is committing either four or five misdemeanors to maintain this pattern and to conceal, at least himself, from any authority.
I. On August 31, 1995, German Court Issues A “Certificate Of Unlawfulness,” And Then Petitioner Files A Request For Return Of Children Under Hague Convention
While Respondent Lops concealed his and the children’s whereabouts in South Carolina, the German court proceedings continued unabated. Although Respondent Lops was never present in court, his counsel was. After a hearing on August 31, 1995, attended by Respondent Lops’s attorney, the German court issued a “Certificate of Unlawfulness.” The “Certificate of Unlawfulness” found that Respondent Lops had not returned the children following a period of visitation, “contrary to the Agreement settled in the presence of the Family Judge.” In that Certificate, the German court further found that Respondent Lops violated Petitioner’s custody rights and was acting unlawfully. Likewise, the district court also found that “Respondents removed the children from the country of their habitual residence in breach of custody rights which Petitioner was actually exercising at the time of removal.”
In September 1995, Petitioner filed a “Request for[1] Return” of the children under the Hague Convention with the Central Authority in Germany.
J. On September 26, 1995, German Family Court Awards Petitioner Temporary Sole Custody Of The Children
On September 26, 1995, Judge Giwitz conducted another custody hearing. Respondent Lops’s attorney again appeared and contended that Petitioner should not have sole custody of the children due to her own misconduct and that the German court lacked jurisdiction. Since the children had lived in Germany with their parents since birth, Judge Giwitz’s September 26 order rejected Respondent Lops’s contentions and determined that Germany was the state of habitual residence and that the German court had jurisdiction.
The district court found that the orders of the German courts regarding custody were valid and further showed that Respondent Lops had violated Petitioner’s custody rights. In the September 26, 1995 order, Judge Giwitz recited the history of the case, including the parties’ agreement announced before him on May 10, 1995. Judge Giwitz’s order specifically found that Petitioner had been the most important person in the children’s lives, that the children had developed well in the care of their mother, and that Petitioner was able to educate the children. In contrast, Respondent Lops’s behaviors, including his misrepresentations to the court and violations of the parties’ custody agreement, persuaded Judge Giwitz to find in his September 26 order that Respondent Lops was concerned more with his own interests than the children’s welfare, and, that Respondent Lops was not able to educate the children properly. Consequently, the German family court awarded Petitioner sole temporary custody of the children. Respondent Lops’s attorney appealed Judge Giwitz’s order.
K. On January 11, 1996, German Appellate Court Affirms Grant Of Custody To Petitioner
On January 11, 1996, a German appellate court affirmed Judge Giwitz’s temporary grant of sole custody to Petitioner, holding that the children’s habitual residence was Germany. On January 18, 1996, Petitioner petitioned the German family court for a final divorce and permanent custody. On October 7,1996, the German family court pronounced final judgment awarding Petitioner a final divorce and permanent sole custody of both children.
L. In August 1996, Respondent Lops Initiates Divorce Action In South Carolina
Despite the German appellate court’s affirming Judge Giwitz’s award of custody to *933 Petitioner and his counsel’s participating in the German court proceedings, Respondent Lops filed a divorce action in August 1996 in the Family Court of Aiken County, South Carolina. Respondent Lops claims that he attempted service upon Petitioner by mailing papers to her last known German address and that Petitioner failed to respond. Petitioner denies ever receiving them. On September 20, 1996, the South Carolina court entered a pendente lite order pursuant to the Uniform Child Custody Jurisdiction Act based on the residence of Respondent Lops and the children. The South Carolina court’s order awarded Respondent Lops sole temporary custody of the children pending final hearing on the divorce, and held “[a]ll other issues relating to property, visitation, support and the divorce itself’ in abeyance until a final hearing on the merits.
The district court made no findings of fact about what actually happened in this South Carolina divorce action, but rather considered the prior German court orders valid and controlling as to the habitual residence of the children in 1995 and as to who had custody at the time of the removal of the children from Germany. Indeed, the South Carolina divorce action never proceeded to final judgment, while the German divorce and custody action did. Also, the German appellate court affirmed the German family court’s award of custody to Petitioner before Respondent Lops initiated the South Carolina divorce action. The district court did not err in giving priority to the German court’s orders and final judgment in deciding that Petitioner had custody of the children at the time of Respondents’ removal of the children from Germany to the United States.[3]
M. Petitioner’s Two-Year Efforts To Locate Children
The record is replete with evidence of Petitioner’s two-year campaign to locate her children. For example, the district court found that from 1995 to 1997 Petitioner employed the assistance of approximately eleven state, national, and international agencies, including Interpol, the United States State Department, and the Georgia Bureau of Investigation (“GBI”). These agencies searched records (1) in Georgia, where Respondent Harrington lives; (2) in Virginia, where Respondent Lops’s sister lives; and (8) in New York, where Respondent Lops’s adoptive father lives.
The GBI conducted drive-by cheeks at Respondent Harrington’s home. The GBI contacted local school officials and checked credit and employment tax records. These and many other concerted efforts, including the State Department’s initiating database searches such as credit agency reports and the Federal Parent Locator Service, were to no avail. One memo, dated August 9, 1996, from “Interpol Washington” to “Interpol Wiesbaden” in Germany is illustrative of the agencies’ efforts:
Begin message: At the present time, we cannot locate Mr. Michael Raymond Lops and the two children, Carmen and Claire, anywhere in the State of Georgia. The two girls have not been enrolled in school and no sighting has been made of them at their Grandmother’s house in Martinez, Georgia. Several checks have been made on Mr. Lops [sic] Social Security Number in 1995 and again in 1996 but all were negative.[4]
Additionally, the district court noted that there was disputed evidence that Respondent Harrington was contacted by officials in December 1996, but denied knowing the whereabouts of the children. A memo, dated December 12, 1996, from the United States *934 National Central Bureau to the Diplomatic Security Service of the Department of State, states as follows:
Incidentally, Lops’ mother, who resides in Martinez, Georgia, refuses to admit knowing where [Respondent Lops] and the children can be found. I can locate no other trace as to their current whereabouts.
Ultimately, officials contacted the District Attorney’s office in Georgia’s Augusta Judicial Circuit, where Respondent Harrington lives. The District Attorney’s office received authorization from the Superior Court of Columbia County, Georgia, also located in the Augusta Judicial Circuit, to place a wiretap on Respondent Harrington’s telephone. Through wiretaps, officials ascertained the whereabouts of Respondent Lops and the children, as well as when the children would be at Respondent Harrington’s home in Georgia.
On November 3, 1997, as a result of the GBI’s requesting custody of the children, the Superior Court of Columbia County, Georgia issued an order directing law enforcement to seize the children and surrender custody to the Georgia Department of Family and Children Services (“DFACS”). On November 5 or 6, 1997, DFACS took custody of the children at Respondent Harrington’s home.[5] Petitioner took a leave of absence from work and immediately came to the United States.
II. PROCEDURAL HISTORY

A.Superior Court Of Columbia County, Georgia

On November 12, 1997, Petitioner filed a petition, pursuant to the Hague Convention and ICARA, in the Superior Court of Columbia County, Georgia (the “Georgia court”). Petitioner filed her petition in that forum because that Georgia court had issued the wiretap and seizure orders and because the children were in Columbia County, Georgia, in the custody of Georgia DFACS.
After a hearing, another judge of that same Georgia court entered an order, dated November 15, 1997, finding lack of jurisdiction in Georgia and transferring the case to South Carolina. Instead of dismissing the case, the Georgia court transferred the case to the neighboring court a few miles away in South Carolina, stating in its order that the parties “stipulated to a transfer of the proceedings verses [sic] dismissal and refiling in the event this Court found no authority for exercising jurisdiction in Georgia.”
B. Family Court Of Aiken County, South Carolina
The Family Court of Aiken, South Carolina (the “South Carolina court”) held a brief hearing on November 26, 1997, but determined that it could not hear the merits of the ICARA petition until January 16,1998. In a later order (which Respondents state was entered on December 2, 1997, but which is dated December 11, 1997), the South Carolina court directed that the children be released temporarily from the custody of DFACS in Georgia and placed in the temporary custody of Respondent Harrington in Georgia and that the passports of the children, Respondent Lops, and Respondent Harrington be surrendered.
The Georgia court had transferred the case to South Carolina because the children and Respondent Lops had resided in South Carolina before Georgia DFACS picked up the children. However, the South Carolina court then ordered DFACS in Georgia to release the children to reside in Georgia with Respondent Harrington, albeit temporarily, until the South Carolina court could hear the merits of the ICARA petition.
C. Federal Court In Georgia
On December 3, 1997, Petitioner filed an ICARA petition in the federal district court for the Southern District of Georgia located in Augusta, Georgia. On December 3, 1997, the district court issued an order directing that the custody of the children remain with Georgia DFACS pending further order of the court.
*935 Expediting the case as ICARA and the Hague Convention require, the district court conducted two full days of evidentiary hearings on December 12 and 19, 1997. After closing arguments on December 22,1997, the court orally entered detailed findings of fact and conclusions of law from the bench, plus a written final judgment finding that Respondents had 'wrongfully removed the children from Germany in violation of Petitioner’s custody rights and ordering that the children should be returned to the custody of Petitioner for return to Germany. The children were released to Petitioner.
On December 23, 1997, this court granted Respondents’ “motion for emergency stay” and enjoined all parties from removing the children from Georgia or South Carolina until further order of this court. From December 23,1997 to the present, the children have resided with Petitioner in Georgia. This court also expedited the appeal.
III. EVIDENCE SUPPORTED DISTRICT COURT’S FINDINGS OF FACT
Respondents’ first contention on appeal is that the district court’s factual findings are clearly erroneous. We reject that contention because substantial evidence supports all of the district court’s factual findings.[6] In particular, the district court’s pivotal factual finding that Respondents wrongfully removed the children from Germany in violation of Petitioner’s custody rights is amply supported by the evidence in this record.
In light of the overwhelming evidence of wrongful removal in violation of Petitioner’s custody rights, Respondents’ appeal focuses more on the legal issues regarding whether the district court was precluded from hearing this ICARA petition due to either collateral estoppel or the abstention doctrine. Respondents also contend that even if they wrongfully removed the children, the district court erred in returning the children to Germany because Respondents proved the Veil-settled” affirmative defense to an ICARA petition. We first discuss ICARA and the Hague Convention.
IV. ICARA AND THE HAGUE CONVENTION
Congress enacted ICARA to implement the Hague Convention on the Civil Aspects of International Child Abduction,[7] a treaty to which the United States and Germany are signatories. 42 U.S.C. § 11601(b)(1). The goals of the Convention are “to secure the prompt return of children wrongfully removed to or retained in any Contracting State” and “to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.” The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, art. 1, T.I.A.S. No. 11670, 19 I.L.M. 1501, 1501 [hereinafter “Hague Convention”].
Article 3 of the Hague Convention provides that the removal or retention of a child is wrongful where it violates the custody rights of another person that were actually being exercised at the time of the removal or retention or would have been exercised but for the removal or retention, as follows:
The removal or the retention of a child is to be considered wrongful where—
a it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
*936 Hague Convention, art. 3. The removal of a child from the country of his or her habitual residence[8] is “wrongful” under the Hague Convention if the petitioner “is, or otherwise would have been, exercising custody rights to the child under that country’s law at the moment of removal.” Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir.1996) (citing Hague Convention, art. 3).
Under ICARA, a person may file a petition for the return of a child in any court authorized to exercise jurisdiction “in the place where the child is located at the time the petition is filed,” as follows:
Any person seeking to initiate judicial proceedings under the Convention for the return of a child ... may do so by ... filing a petition ... in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.
42 U.S.C. § 11603(b). ICARA further pro- . vides that a petitioner has the burden to show by a preponderance of the evidence that the petitioner was exercising custody rights at the time of the removal and that the removal was wrongful. 42 U.S.C. § 11603(e)(1)(A); Friedrich, 78 F.3d at 1064. If a petitioner meets this burden, ICARA requires that “[ejhildren who are wrongfully removed or retained ... are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.” 42 U.S.C. § 11601(a)(4).
A court considering an ICARA petition has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute. Friedrich, 78 F.3d at 1063; see also Feder v. Evans-Feder, 63 F.3d 217, 221 & n. 5 (3d Cir.1995); Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir.1995). The Hague Convention is intended to “restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.” Friedrich, 78 F.3d at 1064; see also Feder, 63 F.3d at 221; Rydder, 49 F.3d at 372.
Finally, Article 11 of the Hague Convention contemplates that courts shall expedite ICARA proceedings, stating:
The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.
If the judicial or administrative authority concerned has not reached a decision within six weeks from the date of the commencement of the proceedings, the applicant or the Central Authority of the requested State, on its own initiative or if asked by the Central Authority of the requesting State, shall have the right to request a statement of the reasons for the delay. If a reply is received by the Central Authority of a requested State, that Authority shall transmit the reply to the Central Authority of the requesting State, or to the applicant, as the case may be.
Hague Convention, art. 11. Against this ICARA background, we turn to Respondents’ collateral estoppel argument.
V. COLLATERAL ESTOPPEL
A Georgia Court’s Transfer Order Erroneously Imposed Residency Test On ICARA
Respondents’ collateral estoppel argument is based solely on the Georgia court’s interlocutory order, entered November 15, 1997, transferring Petitioner’s ICARA petition from a Georgia trial court to a South Carolina trial court. The federal district court in Georgia properly found that it had jurisdiction over the ICARA petition because the children, picked up at Respondent Harrington’s home in Georgia, were in Georgia *937 DFACS’s custody at the time the petition was filed and thus were “located” under ICARA in the same place as the district court. The district court also correctly determined that Respondents had more than sufficient contacts with Georgia to satisfy due process requirements.[9] The federal district court concluded that neither res judicata nor collateral estoppel applied because federal district courts must determine their own jurisdiction.[10]
In contrast, the Georgia court’s transfer order incorrectly applied a traditional residency test and erroneously concluded (a) that the children were not “located” in Georgia under ICARA and (b) that it lacked personal jurisdiction over Respondent Lops and the children.[11] “Located” under ICARA does not require a showing of residency but contemplates the place where the abducted children are discovered. 42 U.S.C. § 11603(b). Thus, the children were “located” in Georgia for purposes of ICARA. There was also ample evidence supporting the district court’s finding that Respondents had more than sufficient contacts with Georgia to satisfy due process requirements.
Nonetheless, Respondents contend that under the doctrine of collateral estoppel, the Georgia court’s prior determination, even if erroneous, that jurisdiction did not lie in Georgia barred the federal district court in Georgia from later finding it had jurisdiction over Respondents and the children in order to hear the ICARA petition. Respondents cite several cases for the proposition that when the issue of personal jurisdiction has been fully litigated and finally decided by a state court, that decision must be given full faith and credit in federal court. However, unlike the case before us, each decision cited by Respondents involves a final judgment entered by the state court.[12] Even assuming *938 arguendo that Respondents are correct that a state court final judgment regarding personal jurisdiction may bar a federal court’s reconsidering that issue in certain circumstances, the doctrine of collateral estoppel is inapplicable here because the Georgia court’s interlocutory transfer order was not a final judgment and was not an otherwise final appealable order under Georgia law.
B. Collateral Estoppel Requires A Final Judgment Or A Final Appealable Order
Under the Full Faith and Credit Act, federal courts generally should respect state court judgments, even where erroneous. 28 U.S.C. § 1738; Matsushita Elec. Indus. Co., Ltd. v. Epstein, 516 U.S. 367, 373, 116 S.Ct. 873, 877, 134 L.Ed.2d 6 (1996). In deciding whether the Georgia court’s transfer order is entitled to preclusive effect, this court must determine first whether that order was a “final judgment” under Georgia law. See Gresham Park Community Org. v. Howell, 652 F.2d 1227, 1242 (5th Cir. Unit B Aug.10, 1981); First Nat’l Bank of Dublin v. Colonial Fire Underwriters’ Ins. Co., 160 Ga. 166, 167, 127 S.E. 455 (1925). A final judgment is required before any possibility of application of the doctrine of res judicata or collateral estoppel may arise. Quinn v. State, 221 Ga.App. 399, 471 S.E.2d 337, 339 (1996), aff'd, 268 Ga. 70, 485 S.E.2d 483 (1997); Green v. Transport Ins. Co., 169 Ga.App. 504, 313 S.E.2d 761, 763 (1984). No Georgia cáse has held that a transfer order represents a final judgment in the transferring court, much less given preclusive effect to a transfer order.
Nonetheless, we recognize that under Georgia law finality for preclusion purposes may also be measured by the same standard as finality for appealability purposes. See Gresham Park Community Org. v. Howell, 652 F.2d 1227, 1241-42 (5th Cir. Unit B Aug.10, 1981); see also Culwell v. Lomas & Nettleton Co., 242 Ga. 242, 248 S.E.2d 641, 642 (1978); Dep’t of Corrections v. Robinson, 216 Ga.App. 508, 455 S.E.2d 323, 324 (1995). Therefore, in order to determine whether the transfer order was final for preclusion purposes, we must also examine whether the transfer order could be considered a final appealable order. Close examination of Georgia law reveals that the Georgia court’s transfer order was also not a final appealable order for several reasons.
C. Transfer Order Was Not A Final Appealable Order Under Section 5-6-sma)
First, a transfer order, especially one entered only ten days after a case begins, is an inherently interlocutory order and not appealable. Under Georgia law, the only way this interlocutory transfer order may be converted into a final appealable order is if it falls under this Georgia statute: O.C.G.A. § 5—6—34(a)(1), entitled in part “Judgments and rulings deemed directly appealable.”
*939 Section 5-6-34 provides that an order becomes directly appealable when the case is “no longer pending in the court below,” as follows:
(a) Appeals may be taken to the Supreme Court and the Court of Appeals from the following judgments and rulings of the superior courts, the constitutional city courts, and such other courts or tribunals from which appeals are authorized by the Constitution and laws of this state:
(1) All final judgments, that is to say, where the case is no longer pending in the court below, except as provided in Code Section 5-6-35;____
O.C.GA. § 5-6-34(a)(l) (emphasis supplied). The “in the court below” language in § 5-6-34(a)(1) is generally used to refer to a trial court as distinguished from an appellate court. A literal reading of § 5-6-34(a)(l) supports the conclusion that an order transferring a case from a trial court to a different trial court is not appealable, because that case is still “pending in the court below.” This is especially true here, given the fact that the parties stipulated to a transfer to another trial court, as opposed to a dismissal of the case.
D. Georgia Courts Follow General Rule That Transfer Orders In Civil Cases Are Not Final Judgments
Second, Georgia courts repeatedly have held that transfer orders are not final appeal-able orders under § 5-6-34(a)(l) because a case transferred from one trial court to another trial court is still “pending in the court below.” See, e.g., Wright v. Millines, 212 Ga.App. 453, 442 S.E.2d 304, 304 (1994); Griffith v. Georgia Bd. of Dentistry, 175 Ga.App. 533, 333 S.E.2d 647, 647 (1985).
For example, in Griffith, the action was transferred from a trial court in one jurisdiction to a trial court in a different jurisdiction. The Georgia appellate court dismissed the appeal, concluding that “[t]he subject transfer order is not a final judgment as the case is still pending in the court below, albeit a different court from the one ordering the transfer.” 333 S.E.2d at 647 (emphasis supplied). The appellate court held that “[t]he order is thus interlocutory and not appealable____” Id. This same result prevailed in Wright, which held that the appeal of a transfer of a civil case from one trial court to a different trial court was “premature as there is no final judgment and the case remains pending in the trial court, albeit the Superior Court of Douglas County to which the case was transferred rather than the Superior Court of Fulton County where plaintiff filed his notices of appeal.” 442 S.E.2d at 304 (emphasis supplied).[13]
Finally, Georgia’s general rule that transfer orders are not “final appealable orders” also adheres when an order transfers a case to a different type of trial “court below.” Fulton County Dep’t of Family and Children Servs. v. Perkins, 244 Ga. 237, 259 S.E.2d 427 (1978). Perkins, a child custody case closest in point, merits full review. After Georgia DFACS took custody of their child, the foster parents in Perkins filed a complaint in the superior court for authorization to adopt the child and for a writ of habeas corpus returning the child. The court dismissed all claims but the habeas petition and then transferred the ease to the juvenile court, which earlier had asserted jurisdiction over matters relating to custody of the child. Following the transfer, the juvenile court vacated its earlier order asserting jurisdiction and transferred the case back to the superior court. DFACS appealed contending both transfer orders were “final” because “once a transfer order is entered, then the case is no longer pending in that court____” Id. at 428.
The Georgia appellate court held that neither transfer order was appealable.[14] The *940 appellate court first acknowledged that an order transferring a criminal case from a juvenile court to a superior court may be a final appealable order because it concludes all matters in the juvenile court and changes the nature of the proceeding. Id. at 428-29.[15] The court explained that a transfer order in divorce, alimony, or habeas corpus (custody) cases changes the forum but does not change the nature of the proceeding. Id. at 429. The court concluded that despite the transfer of forum, “[a] transfer of a child custody case is a continuation of that proceeding whereas a transfer of a juvenile for trial of a crime as an adult is not a continuation of the same proceeding." Id. (emphasis supplied). Even though the transferring court loses jurisdiction and the case is no longer pending in that court, Georgia courts repeatedly have held that an order transferring a civil case from one trial court to-another trial court is not appealable because the case is still pending in a court below, albeit a different court below.
As in Perkins, Griffith, and Wright, the transfer of this civil case to another trial court, albeit a South Carolina trial court, is a continuation of the same civil proceeding originally initiated in the Georgia trial court. This case, if anything, presents an even stronger case for a finding of non-appealability under Georgia law because the parties stipulated to the transfer and a continuation of the proceedings, as opposed to a dismissal. The Georgia court’s transfer order in this civil case changed only the forum and not the nature of the proceeding in the court below, and thus is not a final appealable order under Georgia law.[16]
E. Interstate Transfers In Georgia’s Juvenile Court Cases
We note that two Georgia decisions have allowed orders transferring juveniles, adjudicated as delinquent in Georgia, to another state to be appealable, but those cases involve “adjudicatory orders” on the merits of the case and are not applicable here. In the Interest of T.L.C., 266 Ga. 407, 467 S.E.2d 885 (1996); G.W. v. State of Georgia, 233 Ga. 274, 210 S.E.2d 805 (1974).[17] In these two *941 juvenile court eases, the Georgia appellate court allowed juveniles to appeal the “adjudicatory order” transferring their case to another state for disposition because that adjudicatory order also decided the merits of the case, determined whether the juveniles had committed the acts charged, and adjudicated them as delinquent. See O.C.G.A. §§ 15-11-38 and 15-11-35. However, these quasi-criminal juvenile cases do not cite or discuss O.C.G.A. § 5~6-34(a)(l), and never discuss whether the case is still pending “in the court below.” Instead, these cases adopt an equal protection analysis because the juveniles had been adjudicated delinquent, and denying them an opportunity to appeal a finding of guilt denies the juveniles equal protection of the laws. Id. at 806.
In any event, the facts in this case are materially different from those in G.W. and T.L.C. Here, the parties stipulated to the transfer of the case to South Carolina, thus waiving any right to appeal in Georgia and, a fortiori, waiving any equal protection argument. The parties’ stipulation alone makes these juvenile court cases inapplicable. In addition, there was no determination on the merits of Petitioner’s substantive claims, but only a preliminary determination that the Georgia state court was not the proper forum to hear the merits of the case. At a minimum, these juvenile court cases in G.W. and T.L.C. are not persuasive authority for the interpretation a federal court should give to § 5—6—34(a)(1) because they do not cite or discuss this statute. Instead, the civil cases discussed earlier are more closely in point.[18]
F. Parties’ Stipulation to Transfer
Finally, the parties’ unique stipulation to the transfer here makes this transfer order particularly non-appealable under Georgia law. This case remained, by stipulation, in the court below, albeit a different court below. We see no reason a Georgia court would be inclined to hold that parties may convert this inherently interlocutory transfer order under § 5-6-34(a)(l) to a final appeal-able order when they stipulated to the transfer as opposed to a dismissal.[19]
*942 We conclude that Georgia courts would not consider this transfer order in this type of case a final appealable order under § 5-6-34(a)(1) because the case was transferred from one trial court to another trial court and remained pending “in the court below.” Section 5-6-34(a)(l) does not state “no longer pending in the same court” or “no longer pending in a court in Georgia” or “no longer pending in the court that issued the order on appeal,” but states only “no longer pending in the court below.” We should not add qualifying or limiting terms to an otherwise clear state statute. This is also not the construction the Georgia courts have placed on this statute when considering transfer orders in civil cases. We find that the Georgia courts would hold that this type of transfer order, entered only ten days after this civil case was filed, was not a final appealable order under § 5-6-34(a)(l) because the transfer changed only the forum and not the nature of the proceeding and because the parties stipulated to the transfer, as opposed to a dismissal.[20]
VI. ABSTENTION
We next address Respondents’ argument that the exercise of wise judicial administration required the district court, as a matter of law, to abstain due to the parallel South Carolina action. See Moses H. Cone Mem’l Hosp. v. Mercury Constr. Co., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). We hold that the district court did not abuse its discretion in declining to abstain for several reasons.[21]
First, “[ajbstention from the exercise of federal jurisdiction is the exception, not the rule.” Colorado River, 424 U.S. at 813, 96 S.Ct. at 1246. When a parallel state court action exists, the Supreme Court has emphasized that “[t]he doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.” Id. (quoting County of Allegheny v. Frank Mashuda Co., 360 U.S.' 185,188-89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)). “[T]he pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction____” Id. at 817, 96 S.Ct. at 1246 (quoting McClelland v. Carland, 217 U.S. 268, 282, 30 S.Ct. 501, 505, 54 L.Ed. 762 (1910)). Instead, the Supreme Court has emphasized “the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.” Id. at 817, 96 S.Ct. at 1246 (emphasis supplied).
Second, all relevant factors support the district court’s decision to hear the ICARA petition and not abstain. When a *943 parallel state court action pends, the Supreme Court has outlined six factors for federal courts to consider in determining whether to abstain and dismiss a federal action: (1) whether one of the courts has assumed jurisdiction over any property in issue; (2) the inconvenience of the federal forum; (3) the potential for piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal or state law will be applied; and (6) the adequacy of each forum to protect the parties’ rights. Moses H. Cone, 460 U.S. at 15-16, 23-27, 103 S.Ct. at 936-37, 941-43; Colorado River, 424 U.S. at 818, 96 S.Ct. at 1246-47. No one factor is per se determinative. Moses H. Cone, 460 U.S. at 16, 103 S.Ct. at 937. How each factor is weighed depends on the facts of each case. Id.
Here, neither the state nor the federal court had jurisdiction over any property in issue, rendering the first factor inapplicable. The remaining factors all counsel against abstention. The federal forum in Georgia was particularly convenient because the children were in the custody of Georgia DFACS and Respondent Harrington lives in Georgia. Even Respondent Lops’s residence in North Augusta, South Carolina was on the Georgia and South Carolina border and only a few miles from the federal district court in Augusta, Georgia. Although both state and federal courts adequately could protect the parties’ rights, ICARA is a federal statute enacted to implement a treaty entered into by the federal government. Federal law provides the rule of decision in this case, which counsels against abstention by the federal district court.[22] Additionally, there was no threat of piecemeal litigation because the district court could, and did, resolve all issues.
Respondents contend that the South Carolina court’s having jurisdiction first strongly favored abstention here. However, the Supreme Court has explained that the factor of which court first obtained jurisdiction involves more than a chronological assessment of whether the state or federal action was filed first. Rather, the question is whether proceedings are further along in one jurisdiction than in the other. Moses H. Cone, 460 U.S. at 21-22, 103 S.Ct. at 939-40; Noonan South, Inc. v. County of Volusia, 841 F.2d 380, 382 (11th Cir.1988). At the time the district court decided the case, the South Carolina case had just begun. More importantly, ICARA requires expedited judicial proceedings. The ICARA petition was transferred to the South Carolina court on November 15, 1997, but that court indicated on November 26 that it was not able to schedule a hearing on the merits of the wrongful removal until January 16, 1998.
The district court, on the other hand, was prepared to, and did, expedite the ICARA petition as required by ICARA. The ICARA petition was filed in the district *944 court on December 3. The district court conducted two full days of evidentiary hearings on December 12 and 19 and heard closing arguments on December 22, after which the district court immediately dictated comprehensive findings of fact and conclusions of law, covering sixty-four pages of transcript in the record, and entered final judgment. This is what ICARA contemplates.
Respondents also argue that Petitioner, unhappy with the South Carolina court’s releasing the children from Georgia DFACS to Respondent Harrington in Georgia, forum shopped and essentially “removed” her ICARA petition to federal court. Respondents ignore that they were the original forum shoppers. Respondents first tried to forum shop this case away from the German courts, where Petitioner initiated custody proceedings. A German family court had jurisdiction first. Respondent Lops left Germany and wrongfully removed the children from Germany to try to avoid the German court’s order and jurisdiction over him and the children. After Respondent Lops lost on the merits and on the jurisdiction issues before both the German family court and German appellate court, Respondent Lops forum shopped and filed a divorce action in South Carolina in 1996.
While Petitioner normally should select one forum and stay there, the record established that Petitioner’s filing in federal court in Georgia was motivated in large part by the South Carolina court’s inability to hear her ICARA petition in an expedited manner as prescribed by ICARA and the Hague Convention. The dissent advocates that Petitioner’s sole motivation for filing in federal court was because she was “apparently dissatisfied by a temporary custody decision of the South Carolina court” and that the district court failed to consider the “reactive nature of Mrs. Lops’s suit.” However, the record shows that the district court specifically considered the parallel state court proceedings but determined that the concurrent actions were in part caused by “the apparent heavy schedule” of the South Carolina court and Petitioner’s inability to obtain a hearing until January 16 in the South Carolina court—over two months after her ICARA petition was transferred to South Carolina. The district court also recognized that Article 11 of the Hague Convention contemplates an immediate emergency hearing in international child abduction cases and a judicial decision within six weeks. Unlike the South Carolina state court, the district court was able to expedite the matter under the federal ICARA statute and thus the district court exercised its discretion to hear the case.
On appeal, the issue is not what we would have done but whether the district court abused its discretion in making its decision not to abstain. The district court fully considered the fact that a parallel South Carolina action existed, but exercised its discretion not to defer because the state court action had just begun, the South Carolina court, due to an “apparent heavy schedule,” was not able to expedite the case when the federal court could, the construction of a federal statute was involved, and the federal forum was convenient to all parties. The district court acted because the federal law in issue contemplates an expedited hearing but the South Carolina court was failing to act expeditiously.[23]
*945 At a minimum, the parties were equal forum shoppers, which neutralizes this factor in the abstention equation.[24] Application of these Colorado River and Moses H. Cone factors readily reveals why the district court did not abuse its discretion in hearing the case, in declining to abstain, and in expediting the case to final judgment.
VII. RESPONDENTS’ AFFIRMATIVE DEFENSE BASED ON ICARA’S WELL-SETTLED EXCEPTION
Once Petitioner satisfied her burden to show that a wrongful removal from Germany had occurred, the children must be returned to Germany unless Respondents established that any of the Hague Convention’s affirmative defenses apply. 42 U.S.C. § 11603(e)(2); Friedrich, 78 F.3d at 1067. Respondents contend that the children should not be returned to Germany because they showed that the ICARA petition was filed more than one year after the wrongful removal of the children and that the children are now “well-settled” in their new environment. See Hague Convention, art. 12;[25] see also Friedrich, 78 F.3d at 1067. After reviewing the evidence at trial, we conclude that the district court correctly determined that Respondents had not established an affirmative defense under the “well-settled” exception or any other affirmative defense available under ICARA and that the district court did not err in ordering that the children be returned to Germany with Petitioner.[26]
*946 Although the petition was not filed within one year of the wrongful removal, the district court first determined that this one-year time limit, which in some respects is similar to a statute of limitations, may be equitably tolled. In doing so, the district court found that it is difficult to “conceive of a time period arising by a federal statute that is so woodenly applied that it is not subject to some tolling, interruption, or suspension, if it is shown or demonstrated clearly enough that the action of an alleged wrongdoer concealed the existence of the very act which initiates the running of the important time period.” We are not required to reach the issue of whether equitable tolling may apply under ICARA because the evidence supported the district court’s factual finding that the children were not yet “well-settled” under the Hague Convention.
The district court found that “well-settled” means more than having a comfortable material existence. In determining whether the children were “well-settled,” the district court properly considered many relevant factors, including but not limited to several peculiar circumstances surrounding the children’s living environment, Respondent Harrington’s being more involved with the children in certain areas than Respondent Lops,[27] the active measures Respondents were undertaking to keep Respondent Lops’s and the children’s whereabouts coneealed from Petitioner and the German (and other) authorities, and the fact that Respondent Lops could be prosecuted for his violations of state and federal law because he was committing “four and five misdemeanors ... to conceal, at least himself, from any authority.” Other evidence adequately supported the district court’s finding that the children were not “well-settled” as contemplated under ICARA and Article 12 of the Hague Convention. Therefore, we conclude that the district court also did not err in its finding that Respondents had not established that the children were “well-settled.”[28]
VIII. CONCLUSION
We conclude that the district court correctly ordered that the two minor children, Claire Lops and Carmen Lops, be returned to the custody of Petitioner for immediate return to Germany. In accordance with the terms of ICARA and the Convention, the district court’s judgment also correctly resolves only Petitioner’s wrongful removal claim and remands any matter regarding the underlying custody dispute to be resolved by German courts where the litigation between the parties first began and should be resolved.[29] Thus, we affirm the judgment of the district court.
AFFIRMED.

. Judge Giwitz’s correspondence and all of the German courts' orders, and their English translations, were entered in the record at the evidentiary hearing. After observing that the German documents were translated by Petitioner’s German counsel, a partisan individual, the district court noted that a neutral translator subsequently had affirmed that the translations were accurate in most respects.

. Evidence before the district court revealed that while Respondent Lops made some payments in cash, Respondent Harrington made most tuition payments by check.

. The divorce action in the South Carolina court subsequently was stayed in February 1998 pending the outcome of the appeal in this case. Also, we could not locate a final custody or divorce decree by the South Carolina court in the record. Instead, a South Carolina court order,' dated January 28, 1998, states that regarding "the action for Divorce which is pending in this court ..., regardless of previous service, Chistiane [sic] Lops ... [was] served with the Summons and Complaint on January 6, 1998---- [T]he last day for answering or otherwise responding to the Complaint will be February 5, 1998.” This further indicates that the South Carolina divorce action has not proceeded to final judgment.

. The children were enrolled in private school in South Carolina, which is why they could not be located in any public or private school in Georgia.

. The Georgia court’s November 15 order states that the children were picked up on November 6, 1997. However, the parties’ briefs indicate that the children were picked up on November 5, 1997.

. We review the district court's factual findings for clear error and its legal conclusions de novo. Lykes Bros., Inc. v. United States Army Corps of Eng'rs, 64 F.3d 630, 634 (11th Cir.1995).

. "The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights.” 42 U.S.C. § 11601(a)(4).

. Respondents argue that the children were with Petitioner in Belgium from January 1995 to May 1995, that their “habitual residence” was Belgium, even though they returned to Germany in early May 1995, and that the Hague Convention and ICARA do not apply because Belgium is not a signatory to the Hague Convention. The federal district court correctly rejected Respondents' argument and did not err in finding that the children's habitual residence since birth had been Germany and still was in Germany at the time of the wrongful removal. Both the German family court and the German appellate court likewise rejected Respondent Lops’s contention that the children’s habitual residence was Belgium and that the German courts lacked jurisdiction.

. Respondent Harrington resides in Martinez, Georgia. Regarding Respondent Lops, the district court found that "on the evidence that I have heard, contrary to the much abbreviated record that was developed before Judge Allgood, these children have a dual residence at least between Anne Harrington's residence in Columbia County and Michael Lops’ house that he occupies, courtesy of his mother, in North Augusta." Respondent Lops and the children regularly went back and forth between Augusta and Martinez, Georgia, and North Augusta, South Carolina. To the extent he worked. Respondent Lops worked for House Rentals, which the district court also found had offices in Georgia, either in Richmond or Columbia County. The record before the district court was replete with other evidence that Respondents had more than sufficient contacts with Georgia to satisfy due process requirements.

. We review the district court's determination that res judicata and collateral estoppel do not apply de novo. See Richardson v. Miller, 101 F.3d 665, 667-68 (11th Cir.1996). The district court's conclusions of law state:
In determining its own jurisdiction a federal district court is not bound by res judicata. Nor are the parties bound by any collateral estoppel with respect to the factual findings made by any other court. Indeed, it is the duty of a federal district court to determine a sufficiency of jurisdictional facts to properly decide or ascertain its own jurisdiction.
On appeal, the parties correctly focus on collateral estoppel since this case involves issue preclusion and not claim preclusion.

. The November 3, 1997 order directing the children to be picked up at Respondent Harrington’s home and placed in the custody of Georgia DFACS was issued by Superior Court Judge Bernard J. Mulherin, Sr., of the Superior Court of Columbia County, Georgia. However, Judge Robert L. Allgood, of that same court, presided over the ICARA action Petitioner filed in the Superior Court of Columbia County, Georgia. In his November 15, 1997 order, Judge Allgood determined that despite "the actual physical seizure of the children in Georgia," there were insufficient contacts in Georgia for personal jurisdiction over the children and Respondent Lops, and thus Judge Allgood transferred the matter to the Family Court of Aiken County, South Carolina. The district court also correctly found that the children's dual residence with Respondent Harrington in Georgia yielded more than sufficient contacts with Georgia to satisfy due process requirements. See supra note 9.

. Each decision cited by Respondents and the dissent involved an actual final dismissal and/or a final judgment entered in the state court action. See Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n., 455 U.S. 691, 706, 102 S.Ct. 1357, 1366-67, 71 L.Ed.2d 558 (1982) (Indiana state court final order settling and dismissing all claims); Durfee v. Duke, 375 U.S. 106, 111, 84 S.Ct. 242, 244, 11 L.Ed.2d 186 (1963) (Nebraska state court final order in quiet title action with no appeal); American Surety Co. v. Baldwin, 287 U.S. 156, 166, 53 S.Ct. 98, 101, 77 L.Ed. 231 (1932) (Idaho state court final judgment on supersedeas bond affirmed on appeal); Baldwin v. Iowa State Traveling Men's Ass'n, 283 U.S. 522, 524—26, 51 S.Ct. *938 517, 517-18, 75 L.Ed. 1244 (1931) (Missouri state court final default judgment with no appeal); Deckert v. Wachovia Student Fin. Servs., 963 F.2d 816, 819 (5th Cir.1992) (Texas state court final order dismissing case for lack of personal jurisdiction); Harbuck v. Marsh Block & Co., 896 F.2d 1327, 1329 (11th Cir.1990) (New York state court final order granting permanent stay of arbitration with dismissed appeal); Wiggins v. Pipkin, 853 F.2d 841, 842 (11th Cir.1988) (Florida state court final order dismissing case for lack of personal jurisdiction); American Steel Bldg. Co. v. Davidson & Richardson Constr. Co., 847 F.2d 1519, 1521 (11th Cir.1988) (Texas state court final default judgment); Rubaii v. Lakewood Pipe of Texas, 695 F.2d 541, 543 (11th Cir.1983) (Florida state court final order dismissing case for lack of personal jurisdiction); see also United States v. Timmons, 672 F.2d 1373, 1378 (11th Cir.1982) (federal court final judgment in condemnation action).
In contrast, this case does not involve a final judgment or dismissal but only an interlocutory transfer order. The dissent acknowledges that "[t]he wrinkle here is that the Georgia court did not simply dismiss the case." The dissent then dismisses this "wrinkle” as insignificant and advocates that the Georgia courts would still view this interlocutory transfer order as effectively a dismissal and consider the transfer order a final judgment. However, this ignores the fact that Georgia courts have not viewed or recharacterized transfer orders as dismissals but directly have held that transfer orders in civil cases are not final appealable orders because the case is still pending in the court below. See Fulton County Dep’t of Family and Children Servs. v. Perkins, 244 Ga. 237, 259 S.E.2d 427 (1978); Wright v. Millines, 212 Ga.App. 453, 442-S.E.2d 304, 304 (1994); Griffith v. Georgia Bd. of Dentistry, 175 Ga.App. 533, 333 S.E.2d 647, 647 (1985).

. Both Griffith and Wright involved transfers from one court jurisdiction to a separate and distinct court jurisdiction. Wright involved a transfer from the Superior Court of Fulton County in the Atlanta Judicial Circuit in Judicial District 5 to the Superior Court of Douglas County in the Douglas Judicial Circuit in Judicial District 10. Griffith involved a transfer from the Superior Court of Bibb County in the Macon Judicial Circuit in Judicial District 3 to the Superior Court of Fulton County in the Atlanta Judicial Circuit in Judicial District 5.

. The issue in Perkins was whether the transfer orders appealed from were final orders within the meaning of then-existing Ga.Code Ann. *940 §§ 24A-3801 and 6-701. 259 S.E.2d at 428. In 1981, these code sections were renumbered, respectively, as O.C.G.A. § 15-11-64 and O.C.G.A. § 5-6-34, the latter of which is at issue in this case. The court held that the transfer orders were "not final and hence ... not appealable without a certificate of immediate review.” Id. at 429.

. The court was referring to J.T.M. v. State of Georgia, 142 Ga.App. 635, 236 S.E.2d 764 (1977), which held that an order transferring a criminal case from a juvenile court to a superior court for final disposition is a final appealable order. Id. at 765; see also Rivers v. State of Georgia, 229 Ga.App. 12, 493 S.E.2d 2, 4 (1997).

. The dissent concludes that Petitioner was judicially estopped from contending that venue was proper and that personal jurisdiction was present in Georgia. To reach this conclusion, the dissent argues that Petitioner stipulated that venue was improper and that personal jurisdiction was wanting in Georgia. However, Petitioner never made any such stipulation about venue or personal jurisdiction. Instead, the Georgia court's order recites that the parties "stipulated to a transfer of the proceedings verses [sic] dismissal and refiling in the event this Court found no authority for exercising jurisdiction in Georgia.” Petitioner consented to transfer in the event the Georgia court rejected her contentions and found no authority for exercising jurisdiction in Georgia. Petitioner's argument to the district court that venue was proper, and jurisdiction present, was not inconsistent at all with the same arguments Petitioner made to the Georgia court. Judicial estoppel does not apply. Even Respondents admit Petitioner stipulated for the case to be transferred to South Carolina, and Respondents do not contend that Petitioner ever stipulated that venue was improper or personal jurisdiction in Georgia was lacking.

.The dissent also cites Arnold v. Jordan, 190 Ga.App. 8, 378 S.E.2d 139 (1989), involving an interstate transfer order, but the Arnold court "granted the father’s application for discretionary review.” 378 S.E.2d at 141. O.C.G.A. § 5-6-34(b) provides that the courts "may thereupon, in their discretion, permit an appeal to be taken” from certain interlocutory orders or non-final judgments. The dissent concludes that Arnold involves discretionary review of domestic relations cases under O.C.G.A. § 5-6-35(a)(2) and not discretionary review of an interlocutory order or non-final judgment under O.C.G.A. § 5-6-34(b). Arnold cites no statute or decision after its statement granting discretionary review. Thus, Arnold's reference to "discretionary review” could be read to cover both types of discretionary review. Even if the "discretionary review” in Arnold was under only § 5-6-35(a)(2), the parties in Arnold did not consent to a transfer as opposed to a dismissal as the parties did here, which is an important factual distinction. Also, Georgia courts have held that intrastate transfer *941 orders in certain cases are directly appealable which undermines the dissent’s proposed interstate versus intrastate bright-line distinction. Rivers v. State of Georgia, 493 S.E.2d 2, 4 (1997); J.T.M. v. State of Georgia, 142 Ga.App. 635, 236 S.E.2d 764, 765 (1977).

. After acknowledging that intrastate transfers from one trial court to a different trial court are not final appealable orders because Georgia courts hold the case is still pending in the court below, the dissent broadly asserts that interstate transfer orders are treated entirely differently by the Georgia courts. However, the Georgia courts have not created a different rule for transfer orders intrastate versus interstate. For example, in G.W,, the Georgia Supreme Court could have, but did not, create a bright-line rule distinguishing between intrastate transfers and interstate transfers. If the Georgia Supreme Court had wanted to make a new or different rule for all interstate transfers, the court could have noted that, because the case was transferred out of state, it was "no longer pending in any court below.” However, the G.W. opinion does not cite or discuss § 5-6-34(a)(l) and does not address whether the case was “no longer pending in the court below.” Instead, the court employed an equal protection analysis to allow a non-resident juvenile adjudicated delinquent to appeal that adjudication.
Similarly, the Georgia Supreme Court, in T.L.C., did not cite or discuss § 5—6—34(a)(1), or whether the case still was pending in the court below. Rather, the Georgia Supreme Court merely cited G.W. in reaching the same conclusion as G.W. when facing facts materially indistinguishable from G.W. The T.L.C. court did not expand G.W., but rather quoted only from the last sentence of G.W. in support of its conclusion that the litigant in T.L.C. had a right to appeal immediately the adjudicatory order in that case.

. The dissent contends that the Georgia trial court lacked authority to transfer the case to South Carolina, and thus the dissent recharacterizes the transfer order as a dismissal. Since a transfer order is interlocutory and not appealable under Georgia law, the dissent recharacterizes the transfer order as a dismissal in order to make it a final judgment and appealable. There is no statutory or decisional authority for the dissent's proposition that this transfer order should be treated somehow as an effective dismissal.
Further, the parties’ consent to the transfer not only provides the authorization but also waives any right to complain about any error in transferring the case to South Carolina. Respondents wanted the case to go to the South Carolina court, which in turn accepted jurisdiction. Whether the South Carolina court was required to take jurisdiction is not a question we have to face or resolve.
Alternatively, the dissent argues that since the Georgia court lacked authority to transfer the case, the transfer order was "a nullity.” We are aware of no authority which permits, much less *942 compels, us to conclude that a "null” transfer can be considered a "final judgment” for purposes of collateral estoppel. To the contrary, something that is null has no legal or binding force. See Black's Law Dictionary 1067 (6th Ed.1990) (defining "nullity” as "an act or proceeding in a cause which the opposite party may treat as though it had not taken place, or which has absolutely no legal force or effect.”).

. Georgia courts also recognize that the application of collateral estoppel may be avoided where it would result in "manifest injustice" to a party. See Fierer v. Ashe, 147 Ga.App. 446, 249 S.E.2d 270, 273 (1978). Thus, alternatively, Georgia courts, at a minimum, would find that manifest injustice results if preclusive effect is given to this transfer order where the parties stipulated to the transfer and where the Georgia court erroneously interpreted federal law.

. We review the district court's decision whether to abstain for abuse of discretion. See Rindley v. Gallagher, 929 F.2d 1552, 1554 (11th Cir.1991).
The dissent correctly notes that the Colorado River doctrine is not a traditional form of abstention, see Colorado River, 424 U.S. at 817, 96 S.Ct. at 1246, but is based on "considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.' ” Id. (quoting Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)). However, since prior decisions of this court label a federal court’s deference to a parallel state court litigation as a type of abstention, we do likewise. See, e.g., Lake Lucerne Civic Ass’n v. Dolphin Stadium Corp., 878 F.2d 1360, 1373 (11th Cir.1989); Forehand v. First Alabama Bank of Dothan, 727 F.2d 1033, 1035 (11th Cir.1984); Fountain v. Metropolitan Atlanta Rapid Transit Auth., 678 F.2d 1038, 1046 (11th Cir.1982).

. The district court found this factor, as well as others, favored its declining to abstain:
I have had some concerns ... relating to the parallel state proceedings that were originated in Georgia and subsequently transferred to the Family Court of South Carolina. I do not know of any concept that would bar the prosecution of both of these cases at the same time.
Interestingly, because of the apparent heavy schedule of the Family Court of South Carolina, a hearing date could not be established until January 15, 1998. Because of the less demanding schedule apparently, this Court has been able to act and seeks to conclude the matter this 22nd day of December.
I will be the first, in most instances, to give great deference to a pending proceeding in state court. However, the mere pendency of a parallel proceeding does not require the dismissal of a federal suit. This case, in my view.
does not require dismissal of the federal action. Indeed, in my view, it is more appropriate for the federal court to proceed to disposition. After all, the act and the treaty, which the Petitioner seeks to enforce, are creatures of the federal sovereign as opposed to any state’s sovereignty.
The apparent election of the forum by the Petitioner can be and has been easily explained because the Georgia Court’s [sic] were already involved through the efforts of the Georgia Bureau of Investigation to locate the children. And, indeed, Judge Mulherin of the Augusta Judicial Circuit, including Columbia County, had entered the order by which the trap and trace order was permitted with respect to the telephone calls.
These observations, coupled with the fact that the case primarily involved the interpretation and application of federal law, impel me to continue in this matter to a dispositive level in this ICARA petition action.

. The different approaches by the dissent versus the district court to the abstention, or "wise judicial administration,” issue appear to stem in part from the district court’s view that Georgia law enforcement officials were heavily involved and the ICARA petition alleging international child abduction required expedited review but the South Carolina court could not hear the case due to its "apparent heavy schedule.” In contrast, the dissent finds ”[n]o such extenuating circumstances existed here, however.” Nonetheless, the dissent acknowledges that ”[t]his case involves legal claims of significant human importance,” which is exactly why the district court expedited the case when the South, Carolina court failed to schedule a hearing expeditiously in this international child abduction case.
The dissent also emphasizes that Petitioner continued to file pleadings in the South Carolina court action; however, after the district court ruled, Petitioner filed a motion to dismiss the South Carolina action and the Supreme Court of South Carolina ultimately stayed the South Carolina action. The record also reflects that since her children were in Georgia DFACS's custody, Petitioner obtained a leave of absence from work in Germany and immediately flew to the United States to regain the custody of her children awarded by the German courts and that once in Georgia Petitioner’s main goal was to obtain an *945 expedited hearing on the merits of her international child abduction petition under ICARA as opposed to selecting a particular court or forum for that hearing. The district court recognized this, rejected Respondents’ claims of forum shopping, and expedited the case as ICARA and the Hague Convention require. The dissent’s harsh indictment of Petitioner for "egregious manipulation of ICARA’s system of concurrent jurisdiction” is not supported by the district court’s findings of fact and does not take into account the fact that the district court acted because it found that the South Carolina court was failing to act expeditiously because of its "apparent heavy schedule.” See supra note 22.

. Respondents deciy Petitioner’s forum shopping but ignore not only their own forum shopping but also the misrepresentations made to accomplish their forum shopping. The district court found that Respondent Lops made misrepresentations to the German court and other officials by stating he would return the children to Petitioner after a few hours on May 10, 1995, and by not advising the German family court judge in the July 3, 1995 hearing that his mother already had wrongfully removed the children to the United States on June 27, 1995, and that he was already packing up his furniture and planning to leave on July 8, 1995, and by advising consulate officials on May 30, 1995 that Petitioner had abandoned the children in order to obtain new passports and wrongfully remove the children from Germany. The district court noted that a collateral effect of its decision is to give full faith and credit to the court orders in Germany.

. Article 12 states:
Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith. The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.
Hague Convention, art. 12. Respondents must establish this exception by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B).

.Respondents also contend that they established other affirmative defenses under ICARA by showing that Petitioner had consented, or at least acquiesced by her conduct, to the children’s removal and that there was a significant risk of psychological harm if the children were returned to Germany after two and one-half years in the United States. Respondents have not shown that the district court erred in finding Respondents had not' established these defenses. In particular, the evidence amply supported the district court’s express factual findings that Petitioner had valid custody rights to the children, that Petitioner had persistently prosecuted and protected her custody rights in the German courts, and that Petitioner never consented or acquiesced to the removal but made concerted efforts to locate the children through international, national, and local agencies. Also, in finding that Respondents had not established any ICARA defenses, the district court succinctly noted that “the very idea of these children being placed in a position or status of pawns in the parents’ skirmishes is, I will have to say, repugnant or deplorable. And this proceeding today and its conclusion is only the natural sequel of the initial decision made in May or June of 1995 to bring the children to the United States without the recognition of the mother’s rights as accorded by German law and our treaty.”

. The evidence indicated that although Respondent Lops worked only a few hours each week, Respondent Harrington picked the children up from school each day and attended .more to the nurture and needs of the children. The district court found that Respondent Harrington was "in virtual control of the financial and other affairs of this family. I see that the grandmother [Respondent Harrington] is a co-partner, co-participant in the abduction and in the maintenance of these appearances whose only object could be to conceal the existence of the origins of the children.”

. Respondents also contend (1) that the district court erred in failing to consider the 1996 order in the divorce case Respondent Lops brought in a South Carolina court which awarded custody of the children to Respondent Lops; (2) that the district court did not give Respondents a full and fair hearing; (3) that the district court violated Respondent Lops's procedural and substantive due process rights; and (4) that the district court erred in awarding Petitioner costs, fees, and expenses allowed by 42 U.S.C. § 11607(b)(3). After review, we conclude that each contention lacks merit.

.The dissent acknowledges "the apparent soundness of the district court's ruling on the merits of the ICARA petition” and does not quarrel with our conclusions that the evidence and law supported the district court's findings that Respondents wrongfully removed the children from Germany to the United States in violation of Petitioner's custody rights, that Respondents failed to show that the children were "well-settled” in the United States, and that the children should be returned to Germany. The dissent also agrees "that the Georgia court misinterpreted the ICARA statute” and does not contest our conclusion that the Georgia court's transfer order erroneously held that jurisdiction did not lie in Georgia over Respondents and the children. Instead, the dissent advocates only that the federal district court should have dismissed the case based on collateral estoppel or under the abstention doctrine based on "wise judicial administra *947 tion." Therefore, these two issues have .been discussed in more detail in this decision.

. The Georgia court stated that 42 U.S.C. § 11603(b) (stating that ICARA petition should be filed "in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed”) reflected Congress's intent that ICARA petitions "be filed in the state where the child or children have primarily resided, not necessarily where they are found.” Georgia court's Order of November 14, 1997, at 5. The children’s permanent residence was in South Carolina, even though they were physically located in Georgia when Mrs. Lops filed suit. Thus, the court held that under ICARA Mrs. Lops should have filed suit in a South Carolina court. Id. at 5-7. This holding *948 appears to constitute a ruling that venue did not lie in Georgia.
The Georgia court also determined that it could not exercise personal jurisdiction over Mr. Lops or the children:
But for the actual physical seizure of the children in Georgia, there has been no other minimally sufficient contact between the State of Georgia and the children or Mr. Lops which would rise to a sufficient level to meet [the] due process requirement for this Court to exercise jurisdiction in this matter.
Id. at 6.