In the Matter of Ailin Sofia AHU-MADA CABRERA, an Infant under the age of 16,

Julio Marcelo Ahumada Cabrera, Petitioner,

v.

Nancy Carina Lozano, Respondent.

No. 04–60329–CIV.

United States District Court, S.D. Florida.

May 18, 2004.

Lawrence Sheldon Katz, Miami, FL, for plaintiff.

Christopher Edward Ells, Fort Lauderdale, FL, for defendant.

### ORDER GRANTING PETITION FOR RETURN OF CHILD

DIMITROULEAS, District Judge.

THIS CAUSE is before the Court upon the Emergency Petition for Warrant of Arrest in Lieu of Writ of Habeas Corpus and Petition for Return of Child to Petitioner, filed herein on March 16, 2004 [DE–1] and having considered the Respondent's Answer and Affirmative Defenses, filed herein on May 6, 2004 [DE–12], the parties' testimony and exhibits offered at hearings on the Emergency Petition, and the entire record in this case, the Court finds as follows:

### I. INTRODUCTION

On March 16, 2004, Petitioner Julio Marcelo Ahumada Cabrera ("Petitioner") filed an Emergency Petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction and the implementing legislation, as set forth in 42 U.S.C. § 11603 et seq., entitled the International Child Abduction Remedies Act ("ICARA"). In his Emergency Petition, the Petitioner alleges that the Respondent, Nancy Carina Lozano ("Respondent"), left her family home in Argentina, obtained illegal employment in the United States, and then registered their minor child in school without the knowledge or consent of the Petitioner. Petitioner alleges that the Respondent has refused all requests to return the child to Argentina. Among other things, the Emergency Petition asks this Court for an order directing that the child be taken from the Respondent and returned to the Petitioner so that he may take the child back to Argentina. However, in her Answer and Affirmative Defenses, the Respondent denies these allegations and asserts that the child is now settled and has established her habitual residence in the United States.

Accordingly, the Court conducted evidentiary hearings on the Emergency Petition and heard testimony from both the Petitioner and the Respondent. Additionally, the Court heard the *in camera* testimony of the child involved in this dispute. Based upon all of the testimony and the exhibits provided in this case, the Court will present a brief background of the events leading up to the filing of the Emergency Petition.

### II. BACKGROUND

Minor child Ailin Sofia Ahumada Cabrera was born on October 5, 1994, in Buenos Aires, Argentina. Her father is the Petitioner, Julio Marcelo Ahumada Cabrera, and her mother is the Respondent, Nancy Carina Lozano. The parties are legally married and are not divorced. Although they are not legally separated, they have been physically separated since December of 1996. Moreover, at the time the child came to the United States, the Petitioner and the Respondent were no longer living together.

In October of 2001, the Petitioner signed an agreement that authorized the child to travel to the United States with her mother. Although the agreement indicated that the child was authorized to stay for up to one year, the Petitioner understood that the Respondent and the child were returning in March of 2002. Additionally, the Petitioner asserts that the one year authorization was the minimum time period available when consenting to his daughter traveling to the United States.

Although there is disagreement on this issue, the Respondent testified that the Petitioner was supposed to follow them to the United States when he saved enough money to pay for his transportation. Apparently, both the Respondent and the

child's plane tickets were purchased by the Respondent's sister who currently lives in the United States. Accordingly, in December of 2001, both the Respondent and the child traveled to the United States under the purported reason of visiting the Respondent's sister and taking the child to Walt Disney World. They had round trip tickets and told immigration officials that they were visiting as tourists. However, the Respondent testified that she intended to stay in the United States to seek more favorable employment opportunities.

In January of 2002, the Respondent enrolled the child in Deerfield Beach Elementary School. However, the child transferred from that school when the Respondent left her sister's apartment. The Petitioner testified that he could not locate the child when he called the Respondent's sister because he was told that she was no longer living there. On the other hand, the Respondent testified that the Petitioner always knew where they were staying and the lines of communication were always open. Petitioner testified that he located the Respondent in March of 2002 and was told that the child was registered in school and was not returning to Argentina in March. Petitioner testified that Respondent said that she would "get lost" if he insisted that the child be returned to Argentina before the school year was over. However, the Respondent denied that allegation.

In June of 2002, the child contacted her father asking about her grandmother in Argentina. It was around that time that the Petitioner asserts that he was informed of the Hague Convention. However, the Petitioner testified that his continued communication with the child was based upon not making a claim to return the child.

In October of 2002, a heated argument ensued wherein the Petitioner allegedly told the Respondent that he had prepared the "documents" for the child's return. Petitioner asserted that he then gave the Respondent some time to think it over. However, the Respondent denied these allegations and indicated that because the Petitioner could not save enough money to travel to the United States, he began threatening an action under the Hague Convention if a plane ticket was not purchased for him.

After their last argument, the Petitioner testified that it was difficult to talk with his daughter because "someone" would hang up the phone when he called. Petitioner testified that in January of 2003, the Respondent said that she would return with the child when classes let out in June. Moreover, Petitioner claims that if he did not accept those terms, the Respondent would "get lost" with the child. Accordingly, the Petitioner testified that he agreed to wait until the child finished school in the United States.

Although the Petitioner claims that he had the appropriate documents ready, he also claims that he did not pursue an action under the Hague Convention because the Respondent promised to return in June of 2003. However, the Petitioner asserts that in the middle of June, the Respondent affirmatively indicated that she would not return to Argentina and that the Petitioner would no longer be able to communicate with his daughter. Accordingly, the Petitioner initiated these proceedings through the Central Authority in Argentina. Moreover, the Petitioner testified that he did not know the child's whereabouts from June of 2003 until March of 2004 when he filed this Emergency Petition. Additionally, the Petitioner testified that he only discovered the child's whereabouts through the aid of his attorney in the United States.

## III. DISCUSSION

The Hague Convention on the Civil Aspects of International Child Abduction, as implemented through the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq., was created with the stated purpose "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, intro. The Convention was designed to restore the pre-abduction status quo and to deter parents from crossing international borders in search of a more sympathetic forum. *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir.1998) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)). The underlying premise of the Hague Convention is that a child's country of habitual residence is the place where decisions relating to custody and access are best decided. *Bocquet v. Ouzid*, 225 F.Supp.2d 1337, 1340 (S.D.Fla.2002). Therefore, a court considering an ICARA petition has jurisdiction over the wrongful removal or retention claim but not the underlying custody dispute. *Lops*, 140 F.3d at 936.

To establish a prima facie case for wrongful retention under the Hague Convention, the petitioner must show by a preponderance of the evidence that: (1) the habitual residence of the child immediately before the date of the alleged wrongful retention was in a foreign country; (2) the retention is in breach of custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the alleged wrongful retention. *Bocquet*, 225 F.Supp.2d at 1340 (citing *Lops*, 140 F.3d at 936).

If the petitioner satisfies this burden, then the child must be returned to his or her State of habitual residence unless the respondent can establish one of the following affirmative defenses: (1) the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment; (2) the person seeking return of the child consented to or subsequently acquiesced in the removal or retention; (3) there is a grave risk that the return of the child would expose it to physical or psychological harm; or (4) the return of the child would not be permitted under the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.[1] *Furnes v. Reeves*, 362 F.3d 702, 712 (11th Cir.2004). However, these affirmative defenses have been defined as "narrow" and "a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Friedrich*, 78 F.3d at 1067.

### A. The Prima Facie Case of Wrongful Retention

#### 1. Habitual Residence

Although "habitual residence" is not defined in the Convention, the text of the Convention directs courts to the point in time "immediately before the removal or retention." Hague Convention, art. 3. Furthermore, courts have defined habitual residence as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder v. Evans–Feder*, 63 F.3d 217, 224 (3d Cir.

---

1. Although the first two affirmative defenses require a preponderance of the evidence, the last two affirmative defenses require clear and convincing evidence. *Furnes v. Reeves*, 362 F.3d 702, 712 n. 8 (11th Cir.2004).

1995). Any determination of habitual residence must focus on the child and "the parents' present, shared intentions regarding their child's presence there." *Pesin v. Osorio Rodriguez*, 77 F.Supp.2d 1277, 1284 (S.D.Fla.1999) (quotation marks omitted) (quoting *Feder*, 63 F.3d at 224).

■ However, courts have also noted that a young child does not usually have any "settled purpose" beyond the intentions of his or her parents. *Gitter v. Gitter*, 2003 WL 22775375, *3 (E.D.N.Y. Nov.20, 2003). Because the Convention tries to prevent one parent from unilaterally determining the country in which the child will live, the habitual residence of the child cannot be shifted without mutual agreement. *Id.* Moreover, courts have generally refused to find that the changed intentions of one parent shifted the child's habitual residence. *Mozes v. Mozes*, 239 F.3d 1067, 1077 (9th Cir.2001).

■ In the instant case, it is undisputed that the child's habitual residence prior to visiting the United States was Argentina. The child was born and raised in Argentina, attended school in Argentina, and has a majority of her extended family in Argentina. Although the child has now spent some time in the United States, the Court will not find that her habitual residence has been changed solely because of the unilateral actions of her mother. The child's father consented to her visiting the United States but did not consent to her residing here permanently. Therefore, there was no mutual shared intent for the child to remain in the United States. Further, considering the child's current immigration status and the fact that she has moved approximately five times in the mere two and one-half years spent here, it is difficult to find that the child has any settled purpose whatsoever. Accordingly, the Court finds that the child's habitual residence prior to the alleged wrongful retention was Argentina.

### 2. Custody Rights

■ With respect to the second element of a prima facie case of wrongful retention, the Hague Convention establishes that the law of the country in which the child was habitually resident governs decisions as to whether custody rights existed at the time of the wrongful retention, and further, permits judicial notice to be taken of that country's law. *Shealy v. Shealy*, 295 F.3d 1117, 1124 (10th Cir. 2002). Under the Hague Convention, "rights of custody" are defined as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a). Moreover, the violation of a single custody right suffices to make the removal or retention wrongful. *Furnes*, 362 F.3d at 714. A parent need not even have the primary right of custody to be entitled to return under the Convention as long as the parent has some right of custody. *Id.* at 715.

■ Having established that Argentina was the habitual residence of the child prior to the alleged wrongful retention, the law of Argentina governs decisions as to whether custody rights existed at the time of the retention. Accordingly, the Petitioner asserts that the Patria Potestas (parental authority) in effect in Argentina granted him "rights of custody" within the meaning of the Convention. *See Mendez Lynch v. Mendez Lynch*, 220 F.Supp.2d 1347, 1358 (M.D.Fla.2002). Additionally, the Court notes that the Petitioner is the natural father of the child, that the parties are legally married and are not divorced, and thus far, there have been no custody proceedings in Argentina. Petitioner has provided at least some financial assistance to the child while staying with her mother in Argentina and was required to sign an authorization for the child to travel to the United States. Moreover, the Respondent

has not challenged that the Petitioner has custody rights under the Convention. Accordingly, the Court finds that the evidence supports that the Petitioner had "rights of custody" pursuant to the law of Argentina at the time of the alleged wrongful retention.

### 3. Exercising Custody Rights

■ Although the Hague Convention does not define "exercise" of custody rights, courts have found that in the absence of a ruling from a court in the country of habitual residence, a court should liberally find "exercise" where a parent keeps or seeks to keep any sort of regular contact with his or her child. *Mendez Lynch*, 220 F.Supp.2d at 1359 (quoting *Friedrich*, 78 F.3d at 1065). Therefore, in caring and providing for his daughter at least to some degree, the Court finds that the evidence reflects that the Petitioner was exercising his custody rights at the time of the alleged wrongful retention. Accordingly, the Court finds that the Petitioner has established a prima facie case of wrongful retention under the Hague Convention.

### B. Affirmative Defenses

■ Having satisfied the burden of establishing a prima facie case of wrongful retention, the child must be returned to her State of habitual residence unless the Respondent can establish an affirmative defense. In the instant case, the Respondent argues that these proceedings were commenced more than one year after the retention of the child and that the child is now settled in her new environment. The Respondent has not argued that other affirmative defenses apply such as consent or acquiescence in the child's retention. Moreover, the efforts taken by the Petitioner to obtain assistance in Argentina are inconsistent with any claim of acquiescence. *See Furnes*, 362 F.3d at 724.

■ With respect to an agreement to allow the child to stay in the United States beyond March of 2002, the Court notes the general rule that negotiation should not be translated into acquiescence. *See Antunez–Fernandes v. Connors–Fernandes*, 259 F.Supp.2d 800, 814 (N.D.Iowa 2003). Additionally, the Court notes that ordinary disruptions accompanying repatriation do not by themselves constitute a grave risk of harm. *Blondin v. Dubois*, 238 F.3d 153, 164 (2d Cir.2001). Finally, there has been no support for the affirmative defense relating to human rights and fundamental freedoms. Accordingly, the Court will focus on the one-year limitation period and whether the child has become settled in her new environment.

### 1. The One–Year Limitation Period

■ Article 12 of the Hague Convention mandates the return of children when they have been wrongfully retained, and at the date of the commencement of the proceedings before the judicial or administrative authority of the Contract state, a period of less than one year has elapsed. However, even where the proceedings have been commenced after the expiration of the one-year period, the court shall return the child unless it is established that the child is now settled in its new environment. Hague Convention, art. 12; *Furnes*, 362 F.3d at 723. Moreover, the proceedings are considered commenced on the day the petition is filed with the court. *Gitter*, 2003 WL 22775375, at *4.

■ In the instant case, the Respondent argues that more than one year has elapsed since the allegedly wrongful retention because the Petitioner knew in March of 2002 (the date they were supposed to return) that the Respondent and the child were not returning to Argentina. However, the Court finds that the Respondent's retention only became wrongful under the

Convention when the Petitioner became aware of the Respondent's true intention not to return. *See Zuker v. Andrews*, 2 F.Supp.2d 134, 140 (D.Mass.1998).

After carefully considering the evidence in this case, the Court finds that such date was in June of 2003. The Court notes that the Petitioner agreed to let the child finish the school year ending in June of 2003. Accordingly, when that date came and the Petitioner realized that the Respondent was not returning with the child, he initiated these proceedings and the Emergency Petition was filed on March 16, 2004. Therefore, the Court finds that the instant Petition was timely filed within the one-year period.

Alternatively, even if the period of wrongful retention began in March of 2002, the Court finds that the one-year period should be equitably tolled. The Eleventh Circuit has noted that unless Congress states otherwise, equitable tolling should be read into every federal statute of limitations. *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 706 (11th Cir.1998). Moreover, equitable tolling applies to ICARA petitions where the parent has secreted the child from the parent seeking return. *Furnes*, 362 F.3d at 723 (citing *Mendez Lynch*, 220 F.Supp.2d at 1362–63).

In *Mendez Lynch*, the court noted that equitable tolling principles should apply because otherwise parents who abduct and conceal children for more than one year would be rewarded for their misconduct. 220 F.Supp.2d at 1362–63; *see also Antunez–Fernandes*, 259 F.Supp.2d at 815 (finding that a parent should not benefit from the effects of her actions and the barriers another parent faced in bringing the petition, and further, that those actions were exactly what the Hague Convention sought to remedy).

In the instant case, the record indicates that the Petitioner sought to resolve the situation without resorting to the Hague Convention. *See Mendez Lynch*, 220 F.Supp.2d at 1363. From the period of March of 2002 to the filing of the Emergency Petition, the parties seemed to have made certain arrangements relating to the child finishing school and then returning to Argentina. Additionally, the Court finds that the Petitioner was not fully aware of the child's whereabouts due to the Respondent's frequent moving of residences and the lack of communication between the parties. Therefore, the Court will not penalize the Petitioner for not immediately filing a Petition under the Hague Convention when he agreed to allow the child to finish school. In sum, the Court finds that in June of 2003, the Petitioner affirmatively became aware that the Respondent and the child were not returning to Argentina. Accordingly, the Court finds that the Emergency Petition was timely filed.

### 2. Settled in the New Environment

Alternatively, even if the Petition was filed outside the one-year period and that such period should not be equitably tolled, on a much closer issue, the Court finds that the child is not settled in the United States. Pursuant to Article 12 of the Convention, even where the proceedings have been commenced after the expiration of the one-year period, the court shall return the child unless it is established that the child is now settled in its new environment. Hague Convention, art. 12; *Furnes*, 362 F.3d at 723. Moreover, in determining whether a child is "settled" in its new environment, a court is permitted to consider any relevant factor surrounding the child's living arrangement. *Lops*, 140 F.3d at 946. However, to be settled, there must be substantial evidence of significant connections to the new environment. *In re Koc*, 181 F.Supp.2d 136, 152 (E.D.N.Y.2001) (quoting *Zuker*, 2 F.Supp.2d at 141).

Accordingly, courts have considered the following factors in determining whether a child is settled in a new environment: (1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the mother's employment; and (6) whether the child has friends and relatives in the new area. *In re Koc*, 181 F.Supp.2d at 152; *Gitter*, 2003 WL 22775375, at *5; *Anderson v. Acree*, 250 F.Supp.2d 876, 881 (S.D.Ohio 2002). However, a more comfortable material existence is not dispositive of the child being settled. *Lops*, 140 F.3d at 946. In fact, *Lops* directs courts to look beyond a comfortable material existence and to consider the child's living environment, the involvement of the parents, active measures taken to conceal the child's whereabouts, and the possibility of prosecution for conduct concealing the child. *Lops*, 140 F.3d at 946. Additionally, the uncertain immigration status of a parent and her child is a factor suggesting that a child is not settled. *In re Koc*, 181 F.Supp.2d at 154.

In the instant case, the Court notes that the child has changed schools once and has changed residences approximately five times in the mere two and one-half years that she has been in the United States. *See Mendez Lynch*, 220 F.Supp.2d at 1363 (finding that the children were not well settled and noting that in a short period of time, they lived in seven different locations). Here, the child attends school regularly, but the Court notes that any stability she may enjoy in the United States is significantly undermined by the Respondent's uncertain immigration status. *See In re Koc*, 181 F.Supp.2d at 154. Additionally, considering the Respondent's immigration status, the prospects for any type of long term job stability are not strong. *See Bocquet*, 225 F.Supp.2d at 1349 (finding that even if the one-year period was not tolled, the respondent's employment history was not one of great stability, and the child was not settled in the United States).

The Court has also considered the testimony of the child wherein she indicated that she would like to remain in the United States. Although not dispositive of the issue, the Court finds that her testimony was somewhat persuasive. *See Anderson*, 250 F.Supp.2d at 883–84 (finding that an eight-year-old child was of sufficient age and maturity to permit the court to consider her views). Accordingly, the Court notes that the child appears to be happy and doing well. She is now fluent in English and maintains good grades. She testified that she has some friends here and enjoys playing soccer. However, other than her mother and one aunt, the child has no support system in the United States. On the other hand, the Court notes that she has a parent, grandparents, aunts, uncles, and cousins living in Argentina.

Additionally, the Court notes that in Argentina the child would not be threatened with the possibility of deportation. Thus, the Court finds that it is better for the child to return to Argentina now than for her to be deported at a later date when she has become firmly settled in the United States. *See In re Koc*, 181 F.Supp.2d at 154 (stating the fact that the Immigration Service may not have been looking to deport a mother and child did not guarantee that their status would not change in the future). Finally, a federal court retains the discretion to return a child despite the existence of a valid defense if returning the child would further the aims of the Convention. *See Miller v. Miller*, 240 F.3d 392, 402 (4th Cir.2001). Therefore, based upon all of these factors, the Court finds that the child is not settled in the United States to the extent that she

should not be returned to her habitual residence in Argentina.

## IV. CONCLUSION

Wherefore, it is **ORDERED AND ADJUDGED** as follows:

1. The Petition for Return of Child to Petitioner, filed herein on March 16, 2004 [DE–1] is hereby **GRANTED**.

2. The minor child, Ailin Sofia Ahumada Cabrera, shall be **RETURNED** to Argentina.

3. Pursuant to the Petitioner's indications, the Petitioner shall provide the child's transportation expenses.

4. Unless otherwise agreed in writing, the child shall be returned to Argentina within ten (10) days of the date of this Order.[2]

5. The Respondent may accompany the child to Argentina if she so chooses.

6. Minor child, Ailin Sofia Ahumada Cabrera, shall not be removed from the Southern District of Florida pending her return to Argentina.

7. The Clerk is authorized to release both the Respondent and the child's passports to Petitioner's counsel, Lawrence S. Katz, to facilitate the child's return.

8. Mr. Katz shall return their passports when he is satisfied that the child will be returned to Argentina.

9. The Clerk shall deny any pending motions as moot and close this case.

---

2. However, considering that the current school year is almost over, the parties may choose to wait until school is over before returning the child to Argentina.