In re the Application of Roberto
GIAMPAOLO, Petitioner,

v.

Evelina ERNETA, Respondent.

No. CIV.A. 104CV1395CC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 23, 2004.

William E. Dorris, Kilpatrick Stockton, Chad V. Theriot, Smith Currie & Hancock, Atlanta, GA, for Petitioner.

James Francis Steckbauer, Office of James F. Steckbauer, Atlanta, GA, for Respondent.

## ORDER

COOPER, District Judge.

Pending before the Court is a petition filed by Petitioner Roberto Giampaolo ("Petitioner") under The Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601, *et seq*, for the return of his minor child to Argentina. On August 19, 2004, the Court conducted an evidentiary hearing in this matter and heard from both Petitioner and Respondent Evelina Erneta ("Respondent"). Additionally, the Court heard testimony from the husband and brother of Respondent. The minor child in dispute gave testimony in the Court's chambers. Based upon the testimony heard by the Court, the exhibits entered into evidence, and the Court's review and application of the applicable law, the Court concludes that (1) Respondent wrongfully removed the minor child to the United States in violation of Petitioner's rights of custody; (2) Petitioner was exercising his rights of custody at the time of the minor child's removal; and (3) no affirmative defenses or exceptions warrant the Court not ordering the return of the minor child to Argentina. Therefore, the Court orders that the minor child be returned to Argentina forthwith.

## I. FINDINGS OF FACT

On August 25, 1993, Respondent gave birth to Macarena Sol Giampaolo (the "Child") in Argentina. Petitioner is the father of the Child. Petitioner and Respondent were never married. Thus, the Child was born out of wedlock.

Petitioner, Respondent, and the Child lived together at the same address in Argentina for several years. When the Child was approximately eight (8) years old, Petitioner and Respondent dissolved their relationship. Petitioner moved out of the family's residence, and Respondent and the Child continued to live at that residence Notwithstanding Petitioner's move, Petitioner continued to spend a substantial amount of time with the Child on a daily basis.

On January 16, 2001, Petitioner and Respondent voluntarily executed an agreement (the "Agreement") regarding economical support, custody, and visitation. Pursuant to the translated Agreement, Petitioner agreed to pay a certain amount of money per month for the economic support of the Child. The Agreement also provided that "custody" or "guardianship" ("tenencia") of the Child would be granted to Respondent with the Petitioner maintaining broad visitation rights. After Petitioner and Respondent executed the Agree-

ment and up until the time that the Child was removed from Argentina, Petitioner's contact and relationship with the Child remained the same as it had been prior to the execution of the Agreement.

On September 12, 2001, Petitioner and Respondent, "[i]n exercise of their legal guardianship," executed an Authorization to Travel document, which granted their approval for the Child "to travel to any country in the world, alone or accompanied by another adult, and to subsequently return to [Argentina], until of legal age, as often as is considered necessary..." Petitioner understood that he was executing the document to enable the Child to visit Respondent's brother, who was living and continues to live in the United States.

On November 19, 2001, Respondent went to the Argentine police and made a police report that Petitioner had stated the following to her over the telephone: "I am going to take everything out of your house ... I am going to kill you and your mother. I am going to kick your daughter out. I am going to set her on fire etc." Respondent likewise declared to the Argentine police that Petitioner had made similar threats on several occasions, including in front of the Child and Respondent's mother. Finally, Respondent declared that Petitioner had followed his visitation schedule but had not paid child support. The police spoke with Petitioner about Respondent's allegations, but Petitioner was not arrested. There is no evidence that anything else happened as a result of this police report, and there similarly is no testimony or evidence that either Respondent or the Child were ever harmed by Petitioner.[1]

After Respondent made the above police report, Petitioner continued to spend time with the Child on a daily basis without supervision. The Child was a habitual resident of Argentina until February 18, 2002. On February 18, 2002, Respondent took the Child from Argentina and brought her to the United States. Petitioner did not know that Respondent and the Child were leaving Argentina. On the preceding day, Petitioner had spent hours with the Child and had also spoken to Respondent When Petitioner learned on February 18, 2002, that Respondent had left Argentina with the Child, Petitioner did not know where Respondent and the Child had gone or when they would be returning to Argentina.

While in the United States, Respondent and the Child have had little contact with Petitioner. After Respondent left with the Child on February 18, 2002, Petitioner did not hear from Respondent or the Child until May of 2002. Respondent contacted Petitioner on the telephone on three (3) or four (4) occasions between May of 2002 and August of 2002, although Petitioner did not have a telephone at his home in Argentina.[2] Prior to the instant proceedings, August of 2002 was the last time that Petitioner heard from Respondent and the Child.

Following Petitioner's conversation with Respondent in May of 2002, Petitioner knew that Respondent and the Child were in the United States. However, Petitioner did not know anything else about their location. No one whom Petitioner asked knew or told Petitioner the exact location of Respondent and the Child. When Petitioner asked Respondent their exact location, she would not tell him. Petitioner also asked the Child the exact location where she was living. As soon as the

---

**1.** The Court additionally notes that Petitioner denied the allegations made in the police report and likewise denied ever threatening to harm or harming Respondent or the Child.

**2.** Petitioner apparently had use of a telephone at a neighbor's home, but Respondent contends that the neighbor eventually told her to stop calling the house.

Child would try to tell him, however, Petitioner testified that someone would take the phone away.

On the three (3) or four (4) occasions that Petitioner spoke with Respondent, he inquired about when she would return the Child to Argentina. Respondent informed Petitioner during the first conversation that she had enrolled the Child in school in the United States and that the Child would be back in Argentina at the end of August after the school term concluded. When Petitioner spoke with Respondent in the middle of August of 2002, Respondent told Petitioner that she was waiting on certain paperwork before she sent the Child back to Argentina.

In November of 2002, Petitioner, who still resides in Argentina, contacted the Central Authority in Argentina. He submitted an application for the Child's return in December of 2002. On February 13, 2003, Petitioner executed a Revocation of the Authorization to Travel. On March 17, 2003, the Central Authority finalized Petitioner's application and then sent it to the National Center for Missing and Exploited Children (the "Center for Missing Children"). On June 18, 2003, with the help of the Center for Missing Children and the Gwinnett County Sheriff's Office, Petitioner learned the precise location of Respondent and the Child.

On July 24, 2003, the Center for Missing Children secured an attorney for Petitioner to help him file a Petition for the Child's return. However, the attorney recused himself after a few months with the case. After retaining another attorney, a Petition was filed on May 18, 2004.

Since Respondent and the Child have been living in the United States, they have lived at several residences. The Child has also attended several different schools. The Child performs well in school and attends school regularly. She has made friends and enjoys living in the United States. The Child's uncle and his family reside in the United States, but Respondent no longer communicates with them. The rest of the Child's family is in Argentina, and Respondent does not consider it important to educate the Child on her Argentine roots. Respondent is now married to an individual who is a convicted felon and who also has violated Georgia's Family Violence Act. Nevertheless, the Child likes her stepfather and states that he is actively involved in her life. Respondent and the Child are presently in the United States illegally.

## II. CONCLUSIONS OF LAW

### A. *The Hague Convention and ICARA*

 The Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") was implemented in the United States in 1988 as the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 *et seq.* The Hague Convention was created with the stated purpose "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, Preamble. The goal of the Hague Convention is to restore the *status quo ante* and to deter parents from forum-shopping internationally to resolve custody disputes in a more sympathetic court. *See Lops v. Lops,* 140 F.3d 927, 936 (11th Cir.1998). The United States and Argentina, as signatories to the Hague Convention, are considered "Contracting States."

 Pursuant to Article 19 of the Hague Convention and ICARA, 42 U.S.C. § 11601(b)(4), the court's role in applying the Hague Convention is not to resolve the merits of any custody issue. Rather, the court is to determine whether the child was removed or retained wrongfully from the child's habitual residence. *See Whal-*

*lon v. Lynn,* 230 F.3d 450, 455 (1st Cir. 2000); *Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993).

■ The Hague Convention considers the removal or retention of a child to be wrongful when:

(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention, and

(b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Art. 3. The general rule is that a court shall order the return of a wrongfully-removed or retained child unless more than a year has elapsed between the date of the child's wrongful removal or retention and the date that the proceedings were commenced and the child has become settled in her new environment. Hague Convention, Art. 12, *see also Furnes v. Reeves,* 362 F.3d 702, 710–11 (11th Cir.2004).

■ A parent seeking the return of a child bears the burden to establish wrongful removal or retention by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1)(A). If the petitioner meets this burden, then the parent opposing the child's return has the burden of establishing the applicability of one of the exceptions or affirmative defenses provided in Articles 12, 13, or 20 of the Hague Conven-

tion. 42 U.S.C. § 11603(e)(2)(A), (B).[3] Unless the respondent is successful in raising one of these defenses, the court must order the return of the wrongfully-removed or retained child.

**B. *Petitioner's Prima Facie Case***

■ To establish a *prima facie* case under the Hague Convention, the petitioner must establish the following: (1) the habitual residence of the child immediately before the date of the alleged wrongful removal or retention was in a foreign country, (2) the removal or retention is in breach of custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the alleged wrongful retention. *Lops,* 140 F.3d at 936.

■ In this case, the Child's habitual residence is not at issue. Both parties agree that the Child's habitual residence is Argentina. Therefore, the law of Argentina governs the Court's analysis regarding whether Petitioner had custody rights at the time of the Child's removal or retention from Argentina. *See In re Cabrera,* 323 F.Supp.2d 1303, 1311 (S.D.Fla.2004). Further, the Hague Convention permits the Court to take judicial notice of Argentina's law.[4] *Id.*

■ With respect to custody rights, the Court notes that the Hague Convention distinguishes between "rights of custody" and "rights of access." *See Furnes,* 362 F.3d at 711 "Rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to

3. Depending on the specific exception or affirmative defense being invoked, the respondent must meet his or her burden either by clear and convincing evidence or by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(A)(B).

4. "In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or adminis-

trative authorities of the requested State may take notice directly of the law of, and of judicial and administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Hague Convention, Art. 14.

determine the child's place of residence."[5] Hague Convention, Art. 5(a). "Rights of access," on the other hand, include only "the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention, Art. 5(b). The Hague Convention's remedy of return applies only when a petitioner possesses "rights of custody." *See Gonzalez v. Gutierrez,* 311 F.3d 942, 945 (9th Cir.2002), *Whallon,* 230 F.3d at 455.

Petitioner and Respondent dispute whether Petitioner had custody rights over the Child at the time of her removal from Argentina. To resolve this issue, the Court first notes that Article 7 of the Hague Convention authorizes Central Authorities[6] "to provide information of a general character as to the law of their State in connection with the application of the Convention." In this case, Petitioner has

put into evidence two letters from the Central Authority of Argentina. One letter is to the Center for Missing Children, and the other letter is to Petitioner's counsel.[7] To determine custody rights under Argentine law generally, the Central Authority directs the Court to the Argentine Civil Code.

Under the Argentine Civil Code, the Court finds that Petitioner maintained and continues to maintain rights of custody over the Child pursuant to the Argentine legal concept of *patria potestas.* The Argentine Civil Code, part of which Petitioner has also put into evidence, provides the following. "Patria Potestas denotes the set of rights and duties belonging to the parents in respect to the person and property of their children, for their protection and integral education, from the moment of their conception and while under age and not emancipated."[8] Argentine Civil

---

**5.** "The rights of custody may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention, Art. 3.

**6.** Pursuant to the Hague Convention, "A Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities." Hague Convention, Art. 6.

**7.** The Court notes that both letters contain legal conclusions about the particular rights of Petitioner and Respondent. However, the Court relies on these letters only for the general information that they provide about Argentine law and legal terms Applying the Argentine law (as explained by the Central Authority) to the facts in this case, the Court reaches its own legal conclusions.

**8.** By way of background regarding *patria potestas* generally, one of our sister courts explained

The notion of *patria potestas* predates the modern conception of custody rights, as distinguished from rights of access. The conception has its roots in Roman law and

it specifically referred to paternal power. A father's children were viewed as his chattel. The father's rights in his children went beyond mere rights of custody, as presently conceived, to encompass something akin to ownership Indeed, the definition that appears in Black's Law Dictionary underscores the paternal origins of *patria potestas.* It defines it as follows "[t]he authority held by the male head of a family over his children and further descendants in the male line, unless emancipated."

From Roman times, it appears that the conception of *patria potestas,* as an operative legal conception, took diverging paths in the common law and civil law legal traditions. In the common law legal tradition, *patria potestas* was eroded by the emergence of the conception of *parens patriae* in the Chancery Courts of England Beginning with the conception of *parens patriae,* courts began to move from the paternalistic view of children as chattel to the more utilitarian notion that children are potential citizens that deserve the state's protection. In contrast, the notion of *patria potestas* seems to have survived in many of the world's civil law nations and evolved into a generalized parental right that now includes such duties as support and affection.

Code, Art. 264. The Central Authority's letter to Petitioner's counsel specifically states that the definition of *patria potestas* under the Argentine Civil Code "coincides with the definition of custody given by art 5 of the Convention " Thus, if Petitioner had *patria potestas,* the Court is of the opinion that he had "rights of custody" as conceived under the Hague Convention. *See Whallon,* 230 F.3d at 458 (finding that a petitioner had rights of custody over a child pursuant to Mexico's legal concept of *patria potestas* ); *In re Cabrera,* 323 F.Supp.2d at 1311 (finding that a petitioner had rights of custody over a child pursuant to Argentina's legal concept of *patria potestas* ), *Mendez Lynch v. Mendez Lynch,* 220 F.Supp.2d 1347, 1358 (M.D.Fla. 2002) (same).

In the case of a child who was born out of wedlock and acknowledged by both parents, the exercise of *patria potestas* is given to both of them, "if there was co-habitation." Argentine Civil Code, Art. 264(5). In this case, the parties do not dispute that the Child was born out of wedlock and that she is acknowledged by both parties. Additionally, there is no dispute that there was co-habitation Petitioner and Respondent stipulated that they lived together for several years after the Child's birth. Therefore, under the Argentine Civil Code, both Petitioner and Respondent have the right to exercise *patria potestas* over the Child.

■ The Agreement executed by Petitioner and Respondent did not vitiate Petitioner's *patria potestas* over the Child. According to Respondent, the Agreement unambiguously grants her "custody" of the Child and gives Petitioner only broad visitation rights. To the contrary, Petitioner argues that the Agreement grants Respondent "guardianship" of the Child, not "cus-

tody." In essence, Petitioner and Respondent dispute the proper translation of the word "tenencia." The Court need not decide whether "tenencia" means "custody" or "guardianship," however, because the Central Authority of Argentina has explained the legal meaning of "tenencia." In the Central Authority's letter to the Center for Missing Children, the Central Authority advised that pursuant to Argentina's internal law, the term "tenencia" means "physical custody of the minor" and is not equivalent to legal custody. Therefore, even though Respondent was granted "tenencia" under the Agreement, Petitioner still retained *patria potestas* or joint legal custody over the Child. *Cf. Gonzalez,* 311 F.3d at 945 (holding that legal concept of *patria potestas* did not confer "rights of custody" upon parent seeking return of child to Mexico because the parties had executed a formal, *legal* custody agreement) (emphasis added).

■ Respondent's argument that Petitioner does not have "rights of custody" based on Petitioner's alleged failure to pay child support fails for purposes of this determination under the Hague Convention. Aside from this issue being heavily disputed, the Court believes that the issue is inapposite to its analysis because Respondent has provided no Argentine legal authority to support the proposition that a parent's failure to pay child support strips the parent of *patria potestas.* In contrast, the Court observes that the letter from the Central Authority to Petitioner's counsel expressly states that "[a] parent will only be deprived of the *patria potestas* or its exercise by an express decision on the matter made by the relevant judicial authorities, based in specific causes that would justify such a statement." Here,

*See Lalo v. Malca,* 318 F.Supp.2d 1152, 1154–55 (S.D.Fla.2004) (citations and footnotes omitted).

Respondent has provided no evidence that such an express decision was ever made by a judicial authority. Therefore, the Court gives little consideration to this argument, as the issue is a custody issue that should be addressed by an Argentine court.

Since Petitioner had *patria potestas* over the Child with Respondent, his express consent was necessary for, among other things, the following acts: (1) the child getting married, (2) the child being legally emancipated, (3) the child entering into a religious community, the armed forces or security forces, (4) the child leaving the Republic, and (5) the child bringing a lawsuit. Argentine Civil Code, Art. 264 quater. That Respondent felt the need to request that Petitioner execute the Authorization to Travel document following their execution of the Agreement is further evidence that Petitioner never relinquished or stopped possessing his *patria potestas.*

 Significantly, a petitioner is not required to have physical custody of a child to be entitled to the return of the child under the Hague Convention. *See Furnes,* 362 F.3d at 714. The Eleventh Circuit stated in *Furnes:*

> [T]he violation of a *single* custody right suffices to make removal of a child wrongful. That is, a parent need not have "custody" of the child to be entitled to return of his child under the Convention, rather, he need only have one right of custody. Further, he need not have a *sole* or even *primary* right of custody. *Id.* at 714–15 (citing Hague Convention, Art. 3(a)) (emphasis in original). Therefore, although Petitioner did not have physical custody of the Child, he still retained a bundle of custody rights under the legal concept of *patria potestas,* and the Court finds that those rights are sufficient to constitute "rights of custody" for purposes of the Hague Convention.

 The Court finds that the Child's removal breached Petitioner's rights to exercise *patria potestas* over the Child. Here, the undisputed evidence shows that Petitioner and Respondent executed an Authorization to Travel document. Hence, the child "leaving" Argentina technically was not in violation of Petitioner's rights because she had Petitioner's permission to "travel" outside of the country. However, as the Central Authority of Argentina advises, a parent having *patria potestas* over a child must expressly authorize his or her child to change the place where he or she resides. The evidence in this case demonstrates that Respondent removed the Child from Argentina not to "travel" but to establish a new residence in the United States, without Petitioner's permission or consent. Inasmuch as Petitioner never provided his authorization for the Child to change her place of residence and inasmuch as the Child's removal effectively precluded Petitioner from caring for the Child and making decisions regarding the Child's welfare and upbringing, the Court finds that the Child's removal from Argentina was in breach of Petitioner's "rights of custody."

 With respect to the final prong of Petitioner's *prima facie* case, the Court concludes that the record is replete with evidence that Petitioner was exercising his custody rights at the time of the Child's removal from Argentina to the United States. Courts in the Eleventh Circuit have found that "in the absence of a ruling from a court in the country of habitual residence, a court should liberally find 'exercise' where a parent keeps or seeks to keep any sort of regular contact with his or her child." *In re Cabrera,* 323 F.Supp.2d at 1312 (citing *Mendez Lynch,* 220 F.Supp.2d at 1359).

When the Child was in Argentina, Petitioner picked her up every morning to take

her to school. Petitioner would pick the Child up from school and bring her to the home that he shared with his parents while Respondent was at work Respondent contends that Petitioner was able to spend so much time with the Child because Petitioner did not work,[9] but even if true, this does not rebut Petitioner's claim that he was exercising his custody rights at the time of the Child's removal Additionally, Petitioner testified that he chose the Child's school, and the Court finds Petitioner's testimony on this issue to be credible. Petitioner also has produced receipts showing that he paid for at least some of the Child's private schooling while she was living in Argentina, although Respondent contends that Petitioner and his father share the same name and Petitioner's father may have paid the tuition Notably, Petitioner saw the Child the day before Respondent left Argentina with the Child. Petitioner and the Child had gone to a concert together on a Sunday afternoon, and Petitioner returned the Child to Respondent later that Sunday night. The evidence in this case clearly establishes that Petitioner had regular contact with the Child, cared for the Child, and made decisions about her upbringing.

Further, even after the Child's removal from Argentina, Petitioner contacted friends and relatives of Respondent in an attempt to determine their location and return date. Once he finally talked to Respondent and the Child three (3) months after their departure from Argentina, he sought to get this information from them. When it became apparent that Respondent was not going to return the Child, Petitioner contacted the Argentine authorities and began the processes that led to his filing of the instant Petition. Thus, it can hardly be stated that Petition-

er did not seek to maintain contact with the Child so as to exercise his rights of custody.

C. *Applicability of Affirmative Defenses*

■ Given that Petitioner has satisfied his burden of making out a *prima facie* case, the Court must order that the Child be returned to Argentina unless Respondent can establish the applicability of an affirmative defense or exception. Respondent contends that four (4) affirmative defenses provided by the Hague Convention are applicable: (1) Petitioner untimely filed his Petition, and the Child is now settled in her new environment, (2) Petitioner consented and/or acquiesced to the removal and/or retention of the Child, (3) there is a grave risk that returning the Child to Argentina would subject the Child to physical and psychological harm or otherwise put the Child in an intolerable situation, and (4) the Child objects to being returned to Argentina and has attained an age and degree of maturity at which it is appropriate to take account of the Child's views. Even if an affirmative defense or exception applies, the Court still maintains the discretion to order the return of the Child to Argentina if doing so would further the aims of the Hague Convention. *See Miller v. Miller,* 240 F.3d 392, 402 (4th Cir.2001), *England v. England,* 234 F.3d 268, 270–71 (5th Cir.2000); *Friedrich,* 78 F.3d at 1067, *Feder v. Evans–Feder,* 63 F.3d 217, 226 (3d Cir.1995); *Mendez Lynch,* 220 F.Supp.2d at 1358.

1. *Timeliness of Petition/Settlement in New Environment*

Pursuant to Article 12 of the Hague Convention, a child who has been wrong-

---

9. Petitioner testified that he did work with his family's business and that he received from

$2,000 to $3,000 pesos per month.

fully removed or retained must be returned to his or her habitual residence, when at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State, a period of less than one year has elapsed. Even when the proceedings were commenced after the one-year period, the court must order the return of the child, unless the respondent demonstrates by a preponderance of the evidence that the child is now settled into its new environment. Hague Convention, Art. 12; 42 U.S.C. § 11603(e)(2)(B).

Here, the Petition was filed over two (2) years after the Child left Argentina with Respondent. The Child left Argentina on February 18, 2002. The Petition was not filed until May 18, 2004. Respondent therefore maintains that the Petition is not timely, and the Child has now become settled in her new environment. In response, Petitioner urges the Court to equitably toll the one-year limitation period to account for Respondent's concealment of the exact location where she and the Child were living.

The Eleventh Circuit has held that in cases where a child's location has been concealed, it is proper for a district court to toll the beginning of the one-year period until the child is located. *Furnes*, 362 F.3d at 723 ("We agree with the district court that equitable tolling may apply to ICARA petitions for the return of a child where the parent removing the child has secreted the child from the parent seeking return"), *see also In re Cabrera*, 323 F.Supp.2d at 1313 (applying equitable tolling to Hague petition); *Mendez Lynch*, 220 F.Supp.2d at 1362–63 (holding that equitable tolling applies to Hague petitions because otherwise "a parent who abducts and conceals children for more than one year will be rewarded for the misconduct by creating eligibility for an affirmative defense not otherwise available").

■ Here, Respondent refused to inform Petitioner of the precise location of the Child, and Respondent and the Child changed residences several times. The unrebutted testimony of Petitioner shows that Petitioner did not know the street address, city, or state where the Child was living for over a year after the Child was removed from Argentina. Rather, Petitioner knew only that the Child was in the United States. In November of 2002, not long after Petitioner realized that Respondent was not going to return the Child to Argentina voluntarily, Petitioner contacted the Central Authority in Argentina. Petitioner submitted his Hague Application in December of 2002, and he also provided the Central Authority with the addresses of relatives and friends where the Respondent could be living. In March of 2003, after Petitioner's Hague Application was finalized, the Central Authority sent the application to the Center for Missing Children. The Center for Missing Children then helped Petitioner to identify the precise location of the Respondent and the Child. Petitioner learned the precise location of the Child on June 18, 2003, and filed his Petition on May 18, 2004. The Court is of the opinion that Petitioner's testimony regarding his search for the Child is credible, and Respondent did not refute this testimony. Based on the foregoing, the Court finds that Petitioner timely filed the Petition within one (1) year of learning of the Child's location.

■ Assuming *arguendo* that Petitioner did not file his petition in a timely manner, Respondent has not proven by a preponderance of the evidence that the Child is settled in her new environment. In analyzing the evidence before the Court, the Court notes that it "is permitted to consider any relevant factor surrounding the child's living arrangement." *In re Cabrera*, 323 F.Supp.2d at 1313 (citing *Lops*, 140 F.3d at 946). Such factors

might include the following: (1) the age of the child, (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently, (4) whether the child attends church regularly, (5) the stability of the mother's employment, (6) whether the child has friends and relatives in the new area, (7) the involvement of the parents, and (8) the uncertain immigration status of the parent and her child. *See In re Cabrera*, 323 F.Supp.2d at 1314 (citations omitted).

■ As an initial matter, there does not appear to be any dispute that the Child performs well in school, attends school regularly, participates in some extracurricular activities, has become fluent in English, has made friends here in the United States, and enjoys living with Respondent and Respondent's husband.[10] The Child testified that she has her own room and is excited to have her own computer. All of these factors obviously weigh in favor of finding that the Child is settled in the United States.

However, the undisputed evidence likewise shows that in the two and one-half years that Respondent and the Child have been in the United States, they have lived at least at three (3) different residences[11] and the Child has attended three (3) different schools. *See In re Cabrera*, 323 F.Supp.2d at 1314 (finding that the child had gone to two (2) schools and lived at five (5) separate residences in the two and one-half years that she had been living in

the United States). Moreover, Respondent testified that both she and the Child are here in the United States illegally, although Respondent stated that she has applied for her citizenship.[12] *See id.* (stating that child's stability was undermined by her mother's uncertain immigration status); *In re Koc*, 181 F.Supp.2d 136, 152 (E.D.N.Y.2001) (noting that the immigration status of the child and her mother were uncertain). With the exception of Respondent and Respondent's brother and his family, with whom Respondent no longer communicates, the Child has no family in the United States. The Child's father, maternal and fraternal grandparents, uncle, and cousins are all in Argentina. *In re Cabrera*, 323 F.Supp.2d at 1314 (only mother and aunt were in United States, whereas a host of relatives were in Argentina); *In re Koc*, 181 F.Supp.2d at 152 (finding that child had "beloved" relatives in her habitual residence, although the child also had contact with relatives in the United States). Further, although the Child was born in Argentina and lived there for eight (8) of the ten (10) years of her life, Respondent testified that it is not important to her that the Child know her Argentine heritage. Finally, while Respondent and the Child now live in a house and Respondent has testified that she is married and financially supported by her husband, Respondent's husband admitted at the evidentiary hearing that he is a convicted felon and that he violated Georgia's Family Violence Act in the past.[13]

10. This information was shared by the Child when she testified in the Court's chambers. This testimony will be discussed more fully *infra*.

11. The parties dispute the length of time that Respondent and the Child stayed at Respondent's brother's house upon arriving in the United States. The Respondent's brother, who testified as a witness for Petitioner, stated that Respondent and the Child lived at his house from three (3) weeks to a month. Respondent, on the other hand, acknowledges

staying there only two (2) to three (3) days and does not believe their stay there should qualify as living there.

12. Petitioner was not asked at the evidentiary hearing and did not state whether she had submitted an application for the Child to become a United States citizen.

13. Respondent's husband testified that he was dating Respondent at the time he violated the Georgia Family Violence Act, but the act of

Having carefully weighed and considered all of the above factors, the Court finds that the Child is not settled in the United States to the extent that the Court should not order her return to Argentina.

### 2. Consent or Acquiescence to Removal or Retention

 Respondent next contends that Petitioner consented to the Child's removal from Argentina by executing the Authorization to Travel document. As mentioned above, Article 264 of the Argentine Civil Code required that Respondent and Petitioner both consent to the Child leaving Argentina. With respect to authorizations to travel generally, the Central Authority of Argentina has advised that an authorization to travel grants the child permission to leave the country, not to reside abroad, unless *expressly* stated in the document. With respect to the Authorization to Travel document at issue in this case, there was not an express authorization for the Child to reside abroad. Rather, by its very title and terms, the document was only an authorization to "travel." Therefore, the Court finds that Petitioner did not consent to the Child's removal by executing that document.

Respondent also maintains that Petitioner acquiesced in the Child's removal and/or retention, but Respondent has offered no support for this argument. To the contrary, Petitioner's evidence suggests exactly the opposite. As discussed above with respect to Petitioner's effort to exercise his rights of custody, Petitioner actively sought the return of the Child. To the extent that Respondent successfully negotiated with Petitioner in May of 2002 to allow the Child to remain in the United States through August of 2002, Respondent's retention of the Child in the United States past August was wrongful. Shortly after Petitioner realized that Respondent would not return the Child voluntarily, Petitioner contacted the Central Authority of Argentina, completed a Hague Application, corresponded with the Center for Missing Children, revoked the Authorization to Travel document, and sought legal assistance to file his Hague Petition. Respondent focuses heavily on Petitioner's failure to notify Respondent that he revoked the Authorization to Travel document, but Petitioner had no way to contact Respondent because she was concealing the contact information for the Child and her. The evidence simply does not support Respondent's contention that Petitioner acquiesced to the removal and/or retention of the Child, and Respondent therefore has not met her burden of establishing this defense by a preponderance of the evidence.

### 3. Grave Risk of Harm or Intolerable Situation

 Article 13(b) of the Hague Convention permits a court to decide not to order the return of the child to the habitual residence if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The respondent must prove the applicability of this exception by clear and convincing evidence 42 U.S.C. § 11603(e)(2)(A). This exception, like the other exceptions under the Hague Convention, is to be narrowly construed. *Walsh v. Walsh*, 221 F.3d 204, 217–19 (1st Cir. 2000).

 Courts considering the applicability of the exception under Article 13(b) have determined that "situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport

violence was with respect to his ex-wife, not Respondent.

with the child's preferences" do not create a grave risk of harm or otherwise qualify as intolerable situations. *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir.2001). The potential physical or psychological harm must be "a great deal more than minimal." *Whallon*, 230 F.3d at 459 (quoting *Walsh*, 221 F.3d at 218). Indeed, courts have interpreted "grave risk of harm" in this regard to mean either (1) the return of the child puts the child in imminent danger prior to resolution of custody, such as returning the child to a zone of war, famine or disease, or (2) the case is one of serious abuse or neglect, or extraordinary emotional dependence and the courts in the country of habitual reside rice, for whatever reason, may be incapable or unwilling to give the child adequate protection. *Friedrich*, 78 F.3d at 1069.

In this case, the Court is not persuaded that the Child faces a grave risk of physical or psychological harm or would otherwise be placed in an intolerable situation if returned to Argentina. The only evidence presented that raises the Court's brow is Respondent's testimony that Petitioner has made threats of harm, which Respondent supports with a police report that she filed against Petitioner in November of 2001. While the Court does not dismiss these allegations without giving them due consideration, the Court finds that there is no specific evidence that the Child faces a grave risk of harm. There is no evidence that Petitioner directly threatened the Child, with whom the Court is most concerned for purposes of this determination. More significantly, there is no evidence that Petitioner ever actually harmed Respondent or the Child. Moreover, Petitioner has produced no evidence that Petitioner is otherwise violent. From the day that Respondent filed the police report against Petitioner until the day before Respondent left Argentina with the Child, Petitioner still continued to spend time with the Child unsupervised. Thus,

inasmuch as Respondent could not have perceived the risk of harm to be too great to the Child even immediately following the alleged threats, the Court is unable to find that returning the Child to Argentina would subject her to a grave risk of physical harm or an otherwise intolerable situation because of Petitioner's alleged violent tendencies.

Respondent's other argument, to which the Court gives very little weight, is that the Child should not be returned to Argentina because she has been residing in the United States for over two (2) years and has assimilated to living in the United States. *See Friedrich*, 78 F.3d at 1068 ("A removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted"). In this regard, Respondent states that the Child has taken special courses to assist her in learning English, and the Child has lost her ability to speak Spanish. As a result, Respondent contends that the Child will be set back a grade if she is returned to Argentina and will be subject to humiliation by her classmates. Respondent's contentions constitute nothing more than mere speculation and are insufficient to establish the affirmative defense of grave risk of harm.

Respondent has failed to bring forth the clear and convincing evidence that is necessary for this exception to apply. There are no specific facts in evidence that demonstrate any potential physical harm to the Child. Moreover, there has been no testimony from an expert to establish that returning the Child to Argentina will likely cause her psychological harm. While the Child will likely have to make adjustments if the Court orders her return to Argentina, such adjustments must be made by every child who is returned to his or her habitual residence after being in another

country for an extended period of time. Declining to order the return of the Child under the circumstances presented in this case would frustrate the aims of the Hague Convention and the ICARA rather than further them. Accordingly, the Court concludes that this exception does not apply.

### 4. *Child's Objection to Return*

■■■ Respondent's final argument is that the Child objects to being returned to Argentina, and she is of an age and maturity level at which it is appropriate for the Court to take account of her views. The Court met with the Child in chambers with counsel for Petitioner and Respondent present. The Child informed the Court that she was ten (10) years of age and would soon be eleven (11) on August 25, 2004. The Child acknowledged knowing the difference between right and wrong. Further, the Child recognized the importance of telling the truth and explained potential ramifications of not telling the truth. When asked whether she would tell the truth about the matters at issue, the Child affirmatively responded, "of course." The Child demonstrated that she was articulate, intelligent, and mature. In addition, she provided generally credible testimony, although she appeared somewhat selective in her memories of Argentina. Notwithstanding this latter observation, the Court finds that it is appropriate for the Court to take account of her views.

Based on the Child's testimony, the Court is convinced that the Child does not want to return to Argentina. The Child testified that she likes her school here in the United States and that she makes very good grades. She has made friends at school and enjoys playing with them. The Child likewise testified that she enjoys living with Respondent and that she believes the United States provides her better opportunities than Argentina. The Child expressed that she likes Respondent's husband and thinks it is great that he walks her to the busstop every morning, goes with her to the mall, and takes her to the movies with his other daughter. The Child remembers very little about Argentina and believes that Petitioner only wants her returned to make Respondent mad and sad. The Child was very sad herself that Petitioner is seeking her return.

While the Court takes account of the Child's views, the Court concludes that the Child's views are not determinative in this case. Here, the Child has been in the United States with Respondent exclusively for over two (2) years. The Child only recently saw Petitioner on August 11, 2004, when Petitioner came to the United States for this evidentiary hearing. Naturally, the Child is now accustomed to the United States and has been influenced by Respondent's preference for her to remain here. The Child appears to have internalized Respondent's views about the possibility of being returned to Argentina and being around Petitioner. The Court does not wish to imply that the Child expressed no independent thoughts, but the testimony of the Child must be weighed and considered in its entirety. Thus, to the extent that Respondent has been successful in proving this exception, the Court nevertheless exercises its discretion to order return of the Child in furtherance of the aims of the Hague Convention. *See Feder,* 63 F.3d at 226 (citing Pub. Notice 957,51 Fed. Reg. 10,494, 10,509 (1986)).

## III. CONCLUSION

Based on the foregoing, the Court **ORDERS** as follows:

1. The Courts **GRANTS** Petition for Return of Child to Petitioner [Doc. No. 1].

2. The Child, Macarena Sol Giampaolo, shall be **RETURNED** to Argentina within twenty (20) days of the date of this Order.

3. The Respondent may accompany the Child to Argentina.

4. Should Respondent prove unwilling to accompany the Child to Argentina, the Child shall be returned to Argentina with Petitioner.

5. The Child shall not be removed from the Northern District of Georgia pending her return to Argentina.

6. The passports of Respondent and the Child are to remain with the Clerk until Respondent proffers to the Court evidence that she has purchased a return ticket for the Child.

7. Once the Child is returned to Argentina, the parties' rights are governed under their Agreement and Argentine law.

8. The Court understands that ICARA provides for the payment of attorney's fees and costs. 42 U.S.C. § 11607(b)(3). Thus, Petitioner is **ORDERED** to file any motion for attorney's fees and costs by August 30, 2004. Respondent shall have until September 7, 2004, to oppose said motion.